## John R. Poor & another *vs.* Samuel Oakman.

A., owning land, gave B. a bond for a deed of it. A religious society was afterwards formed, of which B. was treasurer. A. sold the land to the firm of C. & D., and B. surrendered his bond and took from them another bond to convey the land to him upon his paying a certain price for it on or before a specified day. After this day had passed without such payment, the society, through a committee of which D. was chairman, built a meeting-house on the land, upon stone foundations set deep in the ground, procured insurance on it, and put furniture in it. C. was clerk of the society, and solicited subscriptions towards the cost of the building, recommended purchases of the pews as a good investment, and spoke of the building as belonging to the society; it was the general expectation of the members of the society that C. & D. would convey the land to it for the price named in B.'s bond; and on the pastor's asking for a conveyance in order to make the society secure, D. replied that it was in no danger, for it could remove the building when it should choose. After this, C. refused to convey the land to the society till its debts were paid. A creditor sued the society, and attached the meeting-house and furniture on his writ; recovered judgment; and assigned the judgment to C. & D., who directed the officer to sell the attached property on the execution, and were present at the sale. After the officer had received some bids, C. announced that he claimed the building as part of the realty, and should resist its removal by any buyer, and the officer declared that he did not warrant title to any of the property; but the sale proceeded, and the whole property was bid off for an entire price, which the officer received, and out of it paid to C. & D. the amount of their execution, and delivered the key of the meeting-house to the buyer as a symbolical delivery of the property. The buyer gave the key to the sexton, with directions to take care of the property; and C. then expelled the sexton from the building, and took possession of it, whereupon the buyer sued C. for a conversion. *Held*, that the meeting-house was not built on the land as personal property, but was fixed to the realty; and that C. & D. were not estopped to deny the buyer's title in it.

Proof of the taking of exclusive possession of a building by a person who has a right to such possession, and of his putting a new lock on a door, the key of which he knows is held by the owner of some furniture in the building, will not warrant a finding of a conversion of the furniture by him, in the absence of any evidence that he ever made claim to the furniture or hindered its owner from removing it.

Tort by John R. Poor and Samuel A. Carleton for the conversion of a meeting-house and the furniture thereof, in Somerville. Answer, a general denial, and an allegation that the building was real estate belonging to the firm of Oakman & Eldridge, of which the defendant was the surviving partner.

At the trial, before *Morton, J.,* the plaintiffs introduced evidence tending to prove these facts :

The Broadway Congregational Society in Somerville, a religious society, was formed in 1863 ; Poor, Carleton, Oakman and Eldridge were all members of it ; Oakman was clerk, and Carleton treasurer. It appointed a building committee, consisting of Poor, Carleton and Eldridge, of which Eldridge was chairman ; built a meeting-house ; procured insurance on it through Eldridge, as chairman of the committee ; furnished it with a pulpit, pews, carpets, cushions, and other suitable and usual articles of furniture ; raised by subscription part of the cost of the building ; and defrayed the cost of the furniture out of the proceeds of a fair. Carleton, Oakman and Eldridge each subscribed upwards of $1000 towards paying for the building, which was begun in November 1863 and finished during the summer of 1864. The subscribers had a right to take pews, to the amount of their subscriptions, on or before July 1, 1865.

The land which the meeting-house was erected upon belonged originally to the Blue Hill Bank, which had given Carleton a bond for a deed of it. On April 22, 1863, several months after giving him this bond, the bank sold and conveyed the land to Oakman & Eldridge, and Carleton surrendered his bond, and took from Oakman & Eldridge another bond for a deed of it to be delivered by them to him on or before July 1, 1863, on his payment of $1800. When Carleton took his first bond from the bank, he paid the bank $100 for it, and received a receipt for the money. When he surrendered that bond, he gave this receipt to Oakman & Eldridge, and took a like receipt from

them. Carleton was a witness, and testified that the society was not formed when he took the first bond; that he took the bond for himself, and for his own benefit, and not for the society; but that after the building was begun he expected that Oakman & Eldridge would convey the land to the society. It appeared also, from other evidence, including testimony of the pastor of the society, and of Poor, that it was a general expectation among the members of the society that Oakman & Eldridge would convey the land to the society for the price named in Carleton's bond. Poor testified, among other things, that the building was erected on the land of Oakman & Eldridge with their consent, and that " Oakman always spoke of the church as belonging to the society, till the time of the sheriff's sale" hereafter to be mentioned; and Erasmus P. Dyer, the pastor, testified that after the building was finished he called twice upon Eldridge for a deed of the land, and told him "we ought to be secure," and he replied, in Oakman's presence, that the society was in no danger, — that it could remove the building when it chose. There were two sales of pews after the building was finished. At the first sale, Oakman and Eldridge each bought pews. At the second sale, Oakman bought a great number; and at both sales he urged others to buy, and recommended such purchases as a good investment. He also solicited and obtained subscriptions towards the cost of the building. On November 1, 1865, a conversation occurred between Poor and Oakman, which Poor testified to as follows : " I had a talk with Oakman on that day about giving the society a deed. He said the society should not have a deed till every dollar of debt was paid. I asked him to give a deed, that the society might raise money on a mortgage. The society wanted the money to pay its debts. My understanding was, that the society was to have a deed on paying the sum named in Carleton's bond. I offered to pay Oakman the money, and he refused."

Various estimates of the value of the building were made by different witnesses. No one estimated it at less than $12,000, for removal, to be turned into a factory; and some set its value for such a purpose as high as from $15,000 to $17,000. It was

built under the superintendence of an architect, who described it, in his testimony, as a substantial building, but capable of removal; and from plans, and policies of insurance, which were put in evidence, it appeared to have been erected on stone foundations set into the ground to a considerable depth.

At September term 1866 of the superior court in Middlesex, Uriel Adams recovered a judgment against the Broadway Congregational Society for $2590.69, and on September 21, 1866, took out execution thereon. This judgment and execution he duly sold and assigned to Oakman & Eldridge, and Oakman then put the execution into the hands of an officer for service. The material parts of the officer's return, which was dated November 16, 1866, were as follows:

" By virtue of this execution, and by direction of Samuel Oakman, hereinafter named, on the seventeenth day of October, last past, I seized and took, as the property of the within named Broadway Congregational Society, the Broadway Church Building, situated on the corner of Broadway and Central Streets in the town of Somerville and county of Middlesex, also the pews, pew cushions, all the carpets, pulpit, gas fixtures, sofa, chairs, settees and table belonging to said church, being the same that were attached by me on the original writ, and having safely kept the same for the space of four days, and having given public notice of the time and place of the intended sale," " pursuant to said notifications, on the fifteenth day of November current, at twelve o'clock, noon, on said premises, I sold said property by public auction to John R. Poor and Samuel A. Carleton, they being the highest bidders therefor, for the sum of thirty-two hundred dollars, and made and gave them a bill of sale thereof in writing, signed by me, from which sum I have taken the sum of one hundred and sixteen dollars and fifteen cents for my fees, and of the balance I have applied twenty-six hundred and fifteen dollars and fifty-five cents in full satisfaction of the within named judgment, to wit, by paying the same to Samuel Oakman and Benjamin W. Eldridge, to whom the within judgment and execution had been assigned, and the remainder I hold to be disposed of according to law, and so I return this execution satisfied in full."

The officer testified that on the morning of the sale Oakman first told him that he should bid as high as $4000 on the property, and wished him to attach it on another writ in his favor; that he replied that he already held another writ with instructions to attach the property on it; and that thereupon Oakman said that he should not bid much on the property. It appeared by other testimony that this other writ was one sued out by Carleton.

At the sale, after some bids had been made, Oakman, in the presence of Poor and Carleton and the rest of the assembled company, gave public notice that he owned the land and the meeting-house on it, and that, if any one should buy the meeting-house, he would not permit the buyer to remove it. One of the bidders then asked the officer what he would warrant; and the officer replied that he would warrant nothing. After a warm dispute between Poor and Oakman, the sale proceeded, and the entire property was bid off by these plaintiffs, Poor and Carleton, through their attorney, for $3200. They paid the officer that sum, and he delivered the key of the front door of the meeting-house to Poor as a symbolical delivery of the property and the next morning paid to Oakman the amount of the execution and took a receipt for it.

The plaintiffs, at the close of the auction, gave the key to Abraham Coan, the sexton, with directions to lock the doors of the meeting-house, take care of the property, and let nothing go out. Coan waited until the crowd dispersed, and then was busy in the meeting-house, when Oakman came behind him, pushed him out of the front door, bolted it, came out of a side door and demanded the key, but Coan refused to surrender it. A few days afterwards, during an evening service in the meeting-house, the plaintiffs told Coan, in Oakman's presence, to take care of the building; but after the service, Oakman turned off the gas, pushed Coan out of the front door, and said he would call the police if Coan should come in again. Oakman then put new locks on the doors. About this time the plaintiffs' attorney called upon Oakman, and said to him that the plaintiffs contemplated removing the meeting-house, but if he would sell them

the land they would pay its appraised value, and in addition whatever would be the cost of moving the building; and he replied that he owned the building, and would resist any attempt to remove it.

Soon afterwards, on December 9, 1866, the meeting-house was destroyed by fire. Part of the furniture was saved, and removed to a building which belonged to Oakman. After the trial of an action brought by Oakman against the Dorchester Insurance Company, reported 98 Mass. 57, Carleton was notified to take this furniture away. The remnants of the meeting-house, left from the fire, were sold under Oakman's direction, and the proceeds paid to him.

On this evidence, the judge ruled that the plaintiffs were not entitled to recover, directed a verdict for the defendant, and reported his rulings, with a statement of the testimony in detail, for the revision of the full court.

*H. W. Paine & G. A. Somerby,* for the plaintiffs. 1. The plaintiffs bought the meeting-house and furniture at the sale on the execution, and paid the purchase money to the officer, who paid it to the defendant for himself and Eldridge.

2. The house was erected by the society on land of Oakman & Eldridge, with their knowledge and consent, and not under any contract for the purchase of the land by the society. When Carleton's first bond was made, the society had no existence, and the time of the last bond had expired when the house was begun. Carleton took the bond for himself, and not for the society. The society obtained insurance on the house through Eldridge as one of the building committee, and paid the premium. And Eldridge told the pastor, who called on him for a deed, that the society could remove the house whenever it chose. Upon these facts, the plaintiffs contend that the house was personal property of the society, and liable to be taken on execution for its debts. *Osgood* v. *Howard,* 6 Greenl. 452. *Hilborne* v. *Brown,* 3 Fairf. 162. *Jewett* v. *Patridge,* Ib. 243. *Fuller* v *Tabor,* 39 Maine, 519. *Pullen* v. *Bell,* 40 Maine, 314. *Shaw* v. *Carbrey,* 13 Allen, 462. *Hinckley* v. *Baxter,* Ib. 139. *Howard* v. *Fessenden,* 14 Allen, 124, 128. The doctrine of *Hutchins*

v. *Shaw,* 6 Cush. 58, and *King* v. *Johnson,* 7 Gray, 239, is not applicable, as there was no contract or agreement for the purchase of this land or the payment of rent. It was a case of license.

3. The defendant is estopped to deny the title of the plaintiffs. His firm bought the judgment, obtained the execution, put it into the hands of the officer, and ordered him to advertise and sell the meeting-house. He expected to bid himself, and requested the officer to take his writ and attach, that he might receive any surplus ; but finding that he had been anticipated, he resolved " not to bid much." The company was assembled. The officer, in the presence of Oakman and Eldridge, received bids for the house and furniture ; and then, finding that the officer was not likely to sell the house for a nominal price, Oakman for the first time proclaimed himself owner of it and the land. He knew that it was then knocked down to the plaintiffs, and the next day he received and receipted for their purchase money. *Andrews* v. *Lyon,* 11 Allen, 349. *Tobey* v. *Chipman,* 13 Allen, 123. *Hooker* v. *Hubbard,* 97 Mass. 175.

4. If the plaintiffs acquired title in the meeting-house, the proof of the defendant's conversion of it is clear.

5. There was evidence for the jury, of a conversion of the furniture. *Forsyth* v. *Hooper,* 11 Allen, 419. If Oakman expelled the plaintiffs' keeper and put new locks on the doors for the purpose of preventing the removal of the furniture by the plaintiffs, this was a conversion.

*C. B. Goodrich & S. J. Thomas,* for the defendant.

CHAPMAN, C. J. The plaintiffs' title to recover the value of the meeting-house depends upon the question whether it was, at the time of the sale to them, personal estate or a part of the realty. If it was a part of the realty when erected, the legal title to it was at the first in the defendant. What equitable relations existed between him and the society cannot be considered here. The defendant might consent to an oral sale of it to the plaintiffs ; and after such sale, and the severance of the structure from the land, it would become personal property. Not only a structure, but trees, grass, stone in a quarry, and

other things which are a part of the realty, may be sold by oral agreement, and removed by virtue of an oral license; but it is well established law that before the severance the owner may revoke the sale and the license, and no title will have passed to the purchaser, and he will have no right to go upon the land and sever and remove the property. *Claflin* v. *Carpenter*, 4 Met. 580. *Nettleton* v. *Sikes*, 8 Met. 34. *Nelson* v. *Nelson*, 6 Gray, 385. *Stearns* v. *Washburn*, 7 Gray, 187. *Lamson* v. *Patch*, 5 Allen, 586. The principle is well stated in *Giles* v. *Simonds*, 15 Gray, 441. If standing trees are sold, they become personal property by being cut, and the license to go upon the land and take them away becomes irrevocable; but before they are cut the license may be revoked,—otherwise it would *ex proprio vigore* convey an interest in the land. See also *Burton* v. *Scherpf*, 1 Allen, 133, as to the sale of a ticket for a concert. The same doctrine applies to buildings owned as real estate, and sold with intent to be severed. *Shaw* v. *Carbrey*, 13 Allen, 462.

The ground of these decisions is, that the statute of frauds requires that a sale of any interest in real estate, in order to be valid, must be in writing. In this case, if there was any consent given by the defendant to the sale and removal of the building, it was revoked before the sale, and before any attempt to remove or sever the house from the land. If, then, the plaintiffs can maintain this action, it must be upon the ground that the house was built upon the land as personal property, and never became fixed to the realty.

It was not erected as a trade fixture, to be removed before the term of a lease should expire; for there was no lease of the land, even at will, as was held in *Doty* v. *Gorham*, 5 Pick. 487. Nor was it like the building standing on wooden blocks, which was the subject of controversy in *Hinckley* v. *Baxter*, 13 Allen, 139, and which was never annexed to the land. It was a large building, affixed to the soil by stone walls and excavations of considerable depth; and, so far as its character is to be determined by these particulars, it was as completely a part of the realty as any building could be. Nor was it built with any intent it should remain there temporarily, as personal property

under an oral license from the owners of the land, and then be removed, within a reasonable time, upon the revocation of the license. But Oakman & Eldridge had given a bond to Carleton, the treasurer of the society, to convey the land to him on the terms therein stipulated; and it was the expectation of all parties interested in the house, that a conveyance should be made to the society. Carleton testified that he took the bond for his own benefit. This may not be very material, as Carleton was in fact their treasurer. The term stated in the bond had expired; but time was not a material part of the contract. The conduct of Eldridge, in acting as a member of the building committee of the society, and appropriating the money of the subscribers and the society to the building of the house, was inconsistent with such an idea, as were also the repeated declarations of himself and Oakman. Of the same character were their purchase of pews, and their agency in the sale of pews to others. They had also an interest in the structure itself, by investing money in it, both as subscribers and as purchasers of pews. The idea of treating the house as personal property does not appear to have occurred to any one till a question arose as to the time when a conveyance should be made to the society, and Eldridge, in the presence of Oakman, endeavored to quiet apprehensions by stating what he supposed the legal rights of the society were.

In *First Parish in Sudbury* v. *Jones*, 8 Cush. 184, it was held that buildings are part of the freehold; and if erected on the land of another voluntarily and without any contract, they become the property of the owner. But there is no evidence of any contract between the society and Oakman, either express or implied, that the house should be erected on his land as personal property. The agreement is an essential part of the matter. If a husband erect buildings on the land of his wife, they become realty, because he cannot contract with her. *Washburn* v *Sproat*, 16 Mass. 449. So a house erected by a reversioner during the intervening term becomes real estate. *Cooper* v. *Adams*, 6 Cush. 87. So a building erected by one who has a contract for a conveyance of the land is a part of the realty. *Eastman*

v. *Foster*, 8 Met. 19, 26. In *Oakman* v. *Dorchester Insurance Co.* 98 Mass. 57, upon evidence not varying essentially from that which appears in the report of this case, this building was held to be real estate. See also *Howard* v. *Fessenden*, 14 Allen 124, 128.

In *Pullen* v. *Bell*, 40 Maine, 314, it was held that a house erected by one who took possession under an oral agreement for a bond for a deed was personal property, and that a purchaser under an execution might maintain an action of trover against the owner of the land, who would not allow him to remove it. But our cases, cited above, do not sustain this view. There are several other cases in Maine which go further than ours. *Russell* v. *Richards*, 1 Fairf. 429, and 2 Fairf. 371. *Hilborne* v. *Brown*, 3 Fairf. 162. *Jewett* v. *Patridge*, Ib. 243. We are satisfied that the cases in Massachusetts go as far as the statute of frauds will permit. Nor are any of our cases inconsistent in principle with those above cited from our reports. See *Wells* v. *Banister*, 4 Mass. 415; *Doty* v. *Gorham*, 5 Pick. 487; *Ashmun* v. *Williams*, 8 Pick. 402; *Belding* v. *Cushing*, 1 Gray, 576.

Upon the whole, we think there was not sufficient evidence to authorize the jury to find that the building ever was personal estate. Nor was the defendant estopped to revoke his oral consent that the building might be sold and removed. He did nothing that could amount to a legal estoppel.

As to the personal property in the building, it does not appear that he ever made claim to it, or hindered the purchaser from removing it. His contest with Coan was for the possession of the building, and no question arose as to the right of the owners of the furniture to carry it away. But Oakman having a right to the building, had a right to its exclusive possession, and to the possession of the key. This would not amount to a conversion of the furniture.

*Judgment for the defendant.*