HINKLEY & EGERY IRON CO. *vs.* GEORGE N. BLACK.

Penobscot.   Opinion February 27, 1880.

*Fixtures.   Contract of purchase.*

Where a person entered into possession of a tract of land without the payment of rent therefor, and to use and occupy it as his own in accordance with the terms of a contract for its purchase, and erected large and substantial buildings thereon with engines and machinery for the manufacture of an extract of bark for tanning purposes, and then failed to perform the conditions of the contract on his part and thereby acquire the title, the erections, engines and machinery are a part of the realty and cannot be sold as personal property as against the owner of the land.

Nor does it make any difference that the erections were made by a firm while the contract was only with two of its members—provided that the contract was held for the benefit of the firm who made the partial payments and were to have the benefit of the title when obtained.

ON REPORT.

TROVER to recover the value of certain personal property, situated and being in and upon township No. 39, Hancock county, and particularly upon that portion of said township, excepting the western mile strip, viz: The extract works and buildings, the circular saw mill and all tools and machinery in said works and buildings, and all staves and barrel machinery and tools, and the stable sheds and dwelling-house therein, all of the value of nine thousand dollars ($9,000).

The question was, in which party was the title.

The plaintiffs to sustain their title introduced a sealed contract duly executed and delivered to John D. Hopkins and James H. Hopkins, on November 17, 1866, by the defendant, wherein he covenanted and agreed with the said Hopkins their heirs, etc., to convey by deed of warranty to them a certain large tract of land described, the conveyance to be subject to "the following qualifications and explanations, namely, all taxes to be by said Hopkins borne and paid upon any and all of said property which may be apportioned or assessed after the date of this paper, and all losses by fire or freshets, and all other injuries, losses, depreciations, or destructions which may occur without my fault from and after this date, to be upon the risk and liability of said Hopkins, the

same as if they had become absolute purchasers of said property as of this date."

"And said conveyance is also to be made only upon the express condition that the said Hopkins shall pay me on or before the time when the same may become due, severally, the following described notes, of this day, given by said Hopkins to me, namely, four notes, each for the sum of nineteen thousand two hundred and sixty dollars, payable, with interest annually—one in one year, and one of them in two years, and o ne in three years, and one in four years, respectively, from date ; and if said notes and interest thereon, or any one of the same, shall not be paid as the same may become due, then my obligation to convey shall become null and void, time being expressly regarded as of the essence of this agreement. And although the said Hopkins are permitted to go into immediate possession of said prop erty, to use and occupy as their own, still I retain the right, to me and my heirs and administrators, to assume and take and enjoy, without notice or suit, or process or hindrance, possession of any and all of said property, and whatever may be taken from the same, at any and all times, when I may deem such a step expedient for the purposes of my o wn security."

A mortgage from J. D. Hopkins & Co., a firm composed of John D. Hopkins, James H. Hopkins, Charles D. McDonald and Edward K. Hopkins, to the plaintiffs of the property in controversy, dated October 14, 1876, to secure the payment of four certain promissory notes given by the mortgagors to the mortgagees was introduced, also a notice of the foreclosure of the mortgage dated November 13, 1877. All of which were duly recorded.

There was testimony in behalf of the plaintiffs tending to show that J. D. Hopkins & Co. entered into possession under the contract soon after its execution ; that they commenced erecting the buildings thereon in March, 1875, and completed them before October 14, 1876, when the works were completed and in full operation ; that partial payments were made upon the contract, the last payment having been made in 1876, and that they suspended December 5, 1877, and the contract was surrendered to the defendant ; that the partial payments were made by J. D.

Hopkins & Co., and receipts therefore given to J. D. & J. H. Hopkins.

That the defendant knew of the erection of the works and did not object thereto; and that they were erected by and for the firm.

In cross-examination it appeared that at the time of erecting the works, the firm expected to receive the title eventually; that the machinery was put in with the intention that it should be permanent; that the defendant never gave any express consent for the erection of the works, or the putting in of the machinery, nor was there any understanding with the defendant that it should ever be taken off the land; that the firm refused for a while to give the mortgage for the reason that they did not own the land, but finally yielded, being embarrassed at the time.

The buildings were as follows:

A leach house 45 feet square, 48 feet high, in which was an engine, main line of shafting, three pumps, leaches and elevator. The earth was excavated for foundation, and stone foundation, with stone piers under the building. The engines rested on the piers, fastened by anchor bolts. The main shaft ran out into another building, called bark mill, held by couplings bolted to posts. Another upright engine in the condenser house—another building. Steam pumps sat on floor on a six inch timber fastened to the floor through timbers.

Next adjoining was the boiler house 22 by 54 feet brick, and containing the furnaces, two boilers set in masonry in the ground, the building also sitting on masonry. Then the condenser house 52 by 54 feet and 45 high containing large tanks known as coolers. The condensers were built solid in a cradle fastened to the timbers, the whole resting on abutments under the floor. The coolers and condensers were connected with the leaches by pipes.

The bark mill, 13 by 35 feet, into which the main shaft passed, standing on stone piers. The bark mills were built on a foundation in an excavation. The limb cutter was driven from the shaft in the main line and was bolted to the floor. The elevator ran from under the bark mills through into the roof of the main building and delivered the bark into the leaches.

The stave mill contained stave machinery fastened to the floor with bolts.

The saw mill 22 by 65 feet, the foundation of which was excavated and stoned.

All these buildings were connected together and intended to be permanent.

The dwelling house, 24 by 30 feet, sat on cedar posts, intended to be permanent and used for boarding the men engaged in running the mills.

The remaining facts appear in the opinion.

This case was submitted to the law court upon the foregoing evidence, or so much thereof as is legally admissible. If, in the opinion of the court, any of the property claimed in the writ is the property of the plaintiff, judgment is to be rendered for the plaintiff, for such articles as belong to them, without damages; it being agreed that no damages are claimed, the plaintiff instead thereof to have the right to remove such articles within a reasonable time after judgment, with free access to them for that purpose. If none of the property belongs to the plaintiff, then judgment for defendant.

*Wilson & Woodward,* for the plaintiffs, contended that the question involved had already been substantially decided. *Russell* v. *Richards,* 10 Maine, 429. *Wells* v. *Bannister,* 4 Mass. 514. *Osgood* v. *Howard,* 6 Maine, 452. *Pullen* v. *Bell,* 40 Maine, 314. *Rines* v. *Bachelder,* 62 Maine, 95.

Black's knowledge of the erection of the buildings and receipts of further payments in 1876 and 1877, operated as a subsequent assent that the erections might remain and made them personal property same as if he had given previous consent to their erection. *Fuller* v. *Tabor,* 39 Maine, 519. The plaintiffs had a right to rely upon the law of that case as they did. Otherwise they would not have furnished the machinery.

Massachusetts doctrine is different. *Milton* v. *Colby,* 5 Met. 78. *Eastman* v. *Foster,* 8 Met. 19. *Murphy* v. *Morland,* 8 Cush. 575. *Oakman* v. *Dorch. M. F. Ins. Co.* 98 Mass. 57. *Stare decisis.* Broom's Leg. Max. 114-116. 1 Kent's Com. 475-6, 8. *Goodlittle* v. *Atway,* 7 T. R. 395, 415. *Spicer* v.

*Spicer*, Cro. Jac. 527.  *King* v. *St. Paul*, 13 East. 320.  *Western* v. *Mayor of Brooklyn*, 23 Wend. 334, 341.  Ram. Judgmt. c. 14, § 4, appendix 3.  *Briscoe* v. *Bank Com.* (Ky.) 11 Pet. 257, 285.

*C. P. Stetson & L. A. Emery*, for the defendant.

SYMONDS, J.  On the seventeenth day of November, 1866, the defendant gave to John D. Hopkins and James H. Hopkins an agreement to convey to them a large tract of land in Hancock county upon certain specified terms and upon the express condition that the said Hopkins should pay him on or before maturity four notes for $19,260 each, payable with interest annually in one, two, three and four years from that date.  If the notes and interest, or any one of the same, were not paid when due, then the obligation was to be void, time being expressly regarded, as of the essence of the agreement.  The said Hopkins were to go into immediate possession of the land, to use and occupy it as their own, the defendant reserving the right to take possession of the property, and of whatever might be taken from the same, whenever he deemed it expedient for his own security.

The said Hopkins, with Edward K. Hopkins and Charles D. McDonald, forming the firm of J. D. Hopkins & Co., went into possession under the contract, erected large and substantial buildings, with engines and machinery, for the purpose of manufacturing an extract from bark, to be used in tanning.  These are referred to in the writ as the Extract Works.  There were also mills, dwelling-house, stable, and appurtenances.

On the fourteenth day of October, 1876, the said firm of J. D. Hopkins & Co., gave to the plaintiffs a personal mortgage of the buildings so erected, and of the machinery and other property, for an alleged conversion of which by the defendant the plaintiffs in this case claim to recover.

The payments were not all made as required by the contract, and for a certain period there seems to have been a waiver by the defendant of the requirements in regard to time by accepting partial payments at later dates.  The last payment upon the notes, was made in June or July, 1877, in the sum of about $2700.

In December, 1877, the firm of J. D. Hopkins & Co. failed, and went into bankruptcy, leaving about $30,000 of the amount required to entitle the obligees (for it is convenient to speak of this paper as a bond for a deed, though it was in form merely a contract to convey) to a conveyance still unpaid. The contract for conveyance was thereupon given up by J. D. Hopkins & Co. to the defendant, who claimed title and possession of the land and buildings.

The title of the defendant to the land is not disputed. Neither the obligees in the bond, nor the firm of J. D. Hopkins & Co., had any claim to the township except what this paper conferred. There is some discrepancy in the testimony upon the question whether the plaintiffs were expressly notified at the date of their mortgage that the defendant then claimed to hold the buildings as a part of the realty, but there is nothing in the evidence to prove that the plaintiffs had any reason to suppose, or did suppose, that the mortgagors had any other rights than those which grew out of the contract for conveyance and possession and improvement there-under ; unless an inference to the contrary is to be drawn from the terms of the mortgage itself, which contained the usual warranty of title, and from the statement of the president of the plaintiff company, contradicting John D. Hopkins on this point, that there was nothing said about any defect of title at the time the mortgage was given.

The plaintiffs claim the buildings, with their contents of engines machinery and other fixtures, under their mortgage, as personal property.

The defendant claims that, upon failure of the Hopkins to perform the express condition of the bond, the buildings being substantially and to all appearances permanently built, together with whatever appertained to them, were a part of the realty and the property of the owner of the land. By agreement of counsel the court is to pass only on the question of title.

An examination of the evidence, and of the description of the property, satisfies us that upon this issue in regard to the title the property mentioned in the mortgage and claimed in the writ may properly be regarded as an entirety ; because upon the proof we

find no conversion by the defendant of any property which would not upon familiar principles be part of the realty, if the buildings themselves were real estate. The engines, pumps, elevator, furnaces, condensers, coolers, machines for cutting the limbs and grinding the bark, saws and other apparatus, were all parts of the machinery for the extract works and for the mills, connected by shafting and belts, or by pipes, suited and intended for the process of obtaining the extract from the bark, and for other purposes connected with the mills as such, and in the main bolted or secured in a permanent way to the buildings themselves. Such machinery was a part of the mill or factory and real or personal estate according to the character in this respect of the building itself. *Symonds* v. *Harris,* 51 Maine, 20. Our attention in the argument is not called to anything, nor do we perceive anything in the description given by the witnesses, of which on this evidence a conversion by the defendant can be predicated, which would not under our decisions follow the fortunes of the buildings themselves, in respect of being real or personal property.

The dwelling-house stood on cedar posts, but in regard to most of the other buildings, the evidence shows that excavations were made and foundations secured on which the buildings were supported by stone piers and other masonry.

Was this property, on failure of the Hopkins to make the payments in the bond, the real estate of the defendant, or the personal property of the plaintiffs under their mortgage?

In *McRea* v. *Bank,* 66 N. Y. 490, the court, following and approving an earlier decision, states the criterion of an irremovable fixture to be, "the union of three requisites, first, actual annexation to the realty, or something appurtenant thereto; second, application to the use or purpose to which the part of the realty with which it is connected is appropriated; third, the intention of the party making the annexation to make a permanent accession to the freehold."

By the words "actual annexation," in the first of the requisites mentioned we do not imagine that the court intended physical annexation; and we should prefer in its place the phrase, annexation, real or constructive. For, the sufficiency of constructive

annexation in the case of heavy bodies, or of articles, like keys or parts of machinery, specially fitted and designed for particular places, is, we think, universally conceded. It has been very clearly held by this court: "It is the permanent and habitual annexation, and not the manner of fastening, that determines when personal property becomes a part of the realty. . . . . A thing may be as permanently affixed to the land by gravitation as by clamps or cement." *Strickland* v. *Parker*, 54 Maine, 266.

Nor do we perceive that the words "or something appurtenant thereto," in this first requisite, extend the meaning of the words, "the realty," previously used.

Of these three tests by which to determine what constitutes an irremovable fixture, "the clear tendency of modern authority seems to be to give pre-eminence to the question of intention to make the article a permanent accession to the freehold, and others seem to derive their chief value as evidence of such intention." Ewell on Fixtures, 22.

And another authority, after stating the intent, actual or presumed, to be usually the most important circumstance in determining the fact, adds : "But there are some cases in which, though the erection is made by one not the owner of the freehold, an intent to retain the property in the fixtures as chattels could not be presumed, and others in which the policy of the law could not suffer effect to be given to it, if it actually existed. Thus, if one, though not the owner, is in possession under an executory contract of purchase, it is a reasonable presumption that he expects to complete the purchase, and that whatever he attaches to the realty in such a manner that if it were so attached by the owner of the freehold it would become a part of it, he intends shall be a part of it." Cooley on Torts, 429.

"Fixtures attached to premises by one in possession under a contract of purchase, where he fails to perform on his part and thereby to acquire a title, become a part of the realty, like fixtures annexed by a vendor or mortgagor, and may not be removed by him." 1 Wash. R. Prop. 6.

"It is also well settled that the right to remove fixtures annexed to real estate by one in possession thereof under a contract for its

purchase without paying rent therefor, is to be determined by the rule prevailing between grantor and grantee, mortgagor and mortgagee, and not that between landlord and tenant. Fixtures erected under such circumstances may, as against the vendor of the land, neither be removed by the vendee, mortgaged nor sold by him, nor seized and sold on fi. fa. against him as his personal property. . . . . . . . . . . . , . .

According to the better opinion, also, it seems that the rule is the same where possession is taken, and the annexations made under a parol agreement for the purchase of the land, though there is some conflict of authority on the question." Ewell on Fix. 273.

In one of the later notes in Kent (*343) precisely the same rule is given. .

These citations undoubtedly state the result of the authorities on this point. The clear weight of authority is in their support. That this rule holds in Massachusetts is conceded in argument. *Eastman* v. *Foster*, 8 Met. 19, 26. *McLaughlin* v. *Nash*, 96 Mass. 138. *Oakman* v. *Ins. Co.* 98 Mass. 57, and cases cited. *Poor* v. *Oakman*, 104 Mass. 309, 318. *Madigan* v. *McCarthy*, 108 Mass. 376.

The rule declared in these cases is that if one erects a permanent building, like a dwelling-house, on the land of another, voluntarily and without any contract, express or implied, with the land-owner that the building shall not become part of the realty but shall remain personal property, it becomes a part of the realty and belongs to the owner of the soil.

In *Ritchnyer* v. *Morss*, 40 N. Y. 350, it was held that, except in cases where the relation of landlord and tenant exists, one claiming the building as personal property must prove that it was erected upon an agreement between the builder and the owner of the fee of the land that it was to be considered strictly a personal chattel; which is in effect the Massachusetts rule. See, also, *Smith* v. *Benson*, 1 Hill, 176. The same point was expressly decided in *Ogden* v. *Stock*, 34 Ill. 526, and the court says, "if the party making the improvement, as between himself and the owner of the soil, has no right to erect the same as property sep-

arate and distinct from the freehold, an intention so to do, no matter how clearly manifested, is of no avail."

The cases of *Perkins* v. *Swank*, 43 Miss. 349, and *Leland* v. *Gassett*, 17 Vt. 403, are to the same effect, and *Christian* v. *Dripps*, 28 Penn. St. 271, indicates that the same would be held in that state.

It is to be observed that the rule laid down, so far as applicable to this case, is in terms extended only to cases in which the conveyance fails because the obligee does not meet the conditions which were to entitle him to the deed; not to a case in which the obligor on his part refuses to perform the contract. And it was held in *Yates* v. *Mullen*, 24 Ind. 278, that "where A. by permission of B. built a mill on B.'s land under an agreement to purchase the land as soon as B. should have paid an outstanding judgment which formed a lien upon it and in the meantime to own the mill, and B. having failed to satisfy the judgment the land was sold, . . . . the mill remained A.'s personal property and did not pass with the estate."

If the rule is limited to the case of contracts for the conveyance of land, where the failure to perform is on the part of the proposed purchaser, we think it is not in conflict with any decision in this state.

Thus in the case of *Rines* v. *Bachelder*, 62 Maine, 95, cited by the plaintiffs, it appears that the fault was not on the part of the purchaser, but on the part of the vendors, who were unable to give a valid conveyance of the lands; whereupon the purchaser was allowed a reasonable time to remove the buildings as his own personal property.

The cases of *Osgood* v. *Howard*, 6 Maine, 452, and *Fuller* v. *Taber*, 39 Maine, 519, fall substantially within the rule. We think the consent of the land-owner, as intended in these cases, includes not only his consent that the building should be erected on his land, but also that it should remain the personal property of the builder.

Nor can the cases of *Russell* v. *Richards*, 10 Maine, 429, and 11 Maine, 371, and *Pullen* v. *Bell*, 40 Maine, 314, be accepted as settling the law in this state that erections, made under a parol

contract for the purchase of lands, under such circumstances, remain the personal estate of the builder. In the former case it was on the ground, first, that the mill was built on the land of the father with his permission, at the expense and as the property of the son, with an open and express disavowal by the father of any interest in, or claim upon it, and, secondly, that it was a building erected for purposes of trade and manufacture, that the court held the mill to be the personal property of the son and those claiming under him. The decision of *Pullen* v. *Bell*, simply follows that of *Russell* v. *Richards*, and would seem to be justified on the ground that the dwelling-house was not so attached to the realty as to become a part of it.

We think the opinions of the court in these two cases, properly considered, do not conflict with the rule we have drawn from the authorities. The essential distinction in this respect is not between a written and a verbal contract, but between the class of cases in which the failure to convey results from the fault of the vendor, and those in which the purchaser fails to meet the conditions which entitle him to the deed. The right of the latter is merely to perfect his title by performing his contract.

In a later case than those to which we have last alluded, the learned chief justice, delivering the opinion of the court, treats it as well-settled law that such erections made by one occupying land under a bond for a deed are to be regarded as real estate, and are not removable by the occupant as personal property. *Hemenway* v. *Cutter*, 51 Maine, 408. And in regard to verbal contracts for the sale of lands the same result has been distinctly reached in the recent case of *Lapham* v. *Norton.*

Nor do we perceive that it can make any difference that the erections were by the firm, while the contract was only with two of the members who constituted the firm. The contract was made, or at least held, in the interest and for the benefit of the firm. They made the payments upon it. When title was obtained it was to be for the benefit of the firm. If a conveyance had been made to the two, it would have been in trust for the partnership, and would have inured to their advantage. The firm by arrangement with the obligees undertook the performance of their

contract, expecting to have their rights. We do not see that they could have expected, or are entitled to, more.

*Judgment for the defendant.*

BARROWS, DANFORTH, VIRGIN and LIBBEY, JJ., concurred.
APPLETON, C. J. and PETERS, J., did not sit.