STATE OF MAINE
ANDROSCOGGIN, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-22-134

JOSH RINALDI,

Plaintiff

v.

MAINE CORRECTIONAL CENTER,

STATE OF MAINE DEPARTMENT OF
CORRECTIONS, and

STATE OF MAINE,

Defendants

JUN 15 '23 AM10:34
ANDRO SUPERIOR COURT

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

The matters before the court are plaintiff Josh Rinaldi's Motion for Partial Summary Judgment on defendants Maine Correctional Center ("MCC"), Maine Department of Corrections ("MDOC"), and the State of Maine (collectively "Defendants") affirmative defense asserting that the Maine Tort Claims Act, 14 M.R.S. § 8101-8118, bars his claims. Defendants oppose the motion and have filed a Cross-Motion for Summary Judgment seeking judgment on the same defense.

Background

Mr. Rinaldi was an inmate at the MCC from at least September 2020 to April 2021. (Pl.'s Supp.'g S.M.F. ¶ 3; Defs.' Opp. S.M.F. ¶ 3.) Defendants are all agencies of the State of Maine. (Defs.' Add. S.M.F. ¶¶ 1-2.) On the morning of February 28, 2021, Mr. Rinaldi and the other residents of his dorm were called to the chow hall to get breakfast. (Pl.'s Supp.'g S.M.F. ¶ 5; Defs.' Opp. S.M.F. ¶ 5.) To get from the dorm where Mr. Rinaldi was living to the chow hall

1

inmates and prison guards would have to walk through an area known as the "Runway." (Pl.'s Supp.'g S.M.F. ¶ 7.)

The Runway is a paved area similar to a road which runs through the center of the MCC and connects many of the major buildings on the MCC campus, including all of the dorms, the chow hall, the medical building, and the main building. (Pl.'s Supp.'g S.M.F. ¶ 8; Defs.' Opp. S.M.F. ¶ 8.) The general public is not allowed onto the Runway. (Defs. Add. S.M.F. ¶ 4.) The Runway is sometimes used for inmate recreation, such as running laps or playing recreational games. (Pl.'s Supp.'g S.M.F. ¶ 9; Defs.' Opp. S.M.F. ¶ 9.) Vehicles were uncommon on the Runway, though delivery vehicles and maintenance vehicles, which include snowplows and sanding trucks, might drive on the Runway. (Pl.'s Supp.'g S.M.F. ¶ 10; Defs.' Opp. S.M.F. ¶ 10.) Any vehicles on the Runway must be allowed through a locked gate in the fence surrounding the MCC to gain access. (Pl.'s Supp.'g S.M.F. ¶ 10.) The Runway is completely enclosed within the MCC's outer fence. (Pl.'s Supp.'g S.M.F. ¶ 11.) The only ways to access the Runway are through locked gates in the outer fence or through one of the prison buildings. (*Id.*) None of these exits are open to inmates. (*Id.*)

Inmates are not permitted to walk the grounds of the MCC unsupervised at any time. (Pl.'s Supp.'g S.M.F. ¶ 4.) A prison employee was required to inspect the area where the inmates were going to walk before inmates could leave to go to the chow hall. (Pl.'s Supp.'g S.M.F. ¶ 4.) A prison employee would then supervise the inmates as they made their way from the dorm to the chow hall. (Pl.'s Supp.'g S.M.F. ¶ 4.) Mr. Rinaldi frequently accessed the Runway during the day because there was no other way for inmates to get around the MCC. (Pl.'s Supp.'g S.M.F. ¶ 12.)

Mr. Rinaldi slipped on a patch of ice located on the Runway while making his way back from the chow hall after breakfast on the morning of February 28, 2021. (Pl.'s Supp.'g S.M.F. ¶ 13.) The fall caused Mr. Rinaldi to break his right ankle. (*Id.*) The Runway was not salted or sanded at the time. (Pl.'s Supp.'g S.M.F. ¶ 14.) Mr. Rinaldi was taken by stretcher through the main building of the MCC and out of the front door to reach the ambulance. (Pl.'s Supp.'g S.M.F. ¶ 15.)

The general public is not allowed unrestricted access into the MCC, and there are large parts of the facility which are entirely closed to the general public. (Defs.' S.M.F. ¶ 3.) Visitors are allowed into the facility, but only if they are approved by the MDOC. (Defs. Add. S.M.F. ¶ 6.) Some professional and volunteer visitors are allowed on the Runway, but members of the public who were there to visit prisoners were never allowed that far into the facility. (Defs. Add. S.M.F. ¶ 7.) The MCC did not provide any services directed towards the general public at any time during the time period relevant to this lawsuit.[1] (Defs. Add. S.M.F. ¶ 16.)

Standard

Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. City Mortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation omitted).

---

[1] Mr. Rinaldi objects to Defendants' Additional Statements of Material Fact ¶ 16 on the grounds that it improperly asserts a legal conclusion about what facts constitute business services or other services to the general public. The objection is overruled. The court will consider the statement as a limited statement of fact about whether the MCC held itself out to the general public as offering services available in principle to all. An example of this type of government building would be a Bureau of Motor Vehicles Branch Office.

3

"Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." M.R. Civ. P. 56(h)(4). In order to controvert an opposing party's factual statement, a party must "support each denial or qualification by a record citation." M.R. Civ. P. 56(h)(2). "Assertion of material facts must be supported by record references to evidence that is of a quality that would be admissible at trial." *HSBC Mortg. Servs. v. Murphy*, 2011 ME 59, ¶ 9, 19 A.3d 815.

Discussion

The only disputed issue on these Motions for Summary Judgment is whether the MTCA bars Mr. Rinaldi's claim. "MTCA expressly provides that, as a general rule, governmental entities are immune from suit on any and all tort claims seeking recovery of damages."[2] *Klein v. Univ. of Me. Sys.*, 2022 ME 17, ¶ 8, 271 A.3d 777. The MTCA also contains, in section 8104-A, "a cautious waiver of sovereign immunity by the Legislature in certain carefully circumscribed circumstances." *Searle v. Town of Bucksport*, 2010 ME 89, ¶ 27, 3 A.3d 390. The Law Court has consistently required a strict construction of the exceptions to immunity found in the MTCA. *See Convery v. Town of Wells*, 2022 ME 35, ¶ 6, 276 A.3d 504 (collecting cases).

The exception at issue in this case is the "public buildings" exception. Section 8104-A provides, in the relevant part: "A governmental entity is liable for its negligent acts or omissions in the construction, operation or maintenance of any public building or the appurtenances to any public building."[3] 14 M.R.S. § 8104-A (2022). Mr. Rinaldi alleges that he was injured on the Runway, which he argues is an appurtenance to the MCC. Mr. Rinaldi does not argue that he suffered any injuries while inside a public building. Defendants argue (1) that the MCC is not a

---

[2] The parties agree that all defendants are governmental entities within the meaning of the MTCA.

[3] The public buildings exception also contains a list of enumerated exceptions to the exception, none of which are relevant here.

4

public building and (2) the Runway is not an appurtenance to the MCC under Maine case law. Defendants also argue that it is shielded from Mr. Rinaldi's federal law claims by sovereign immunity.

Public Building

The Law Court has never expressly defined the meaning of a "public building" for the purposes of the MTCA. It came closest to doing so in *Rodriguez v. Town of Moose River*, 2007 ME 68, ¶ 33, 922 A.2d 484, where it held "the function a building performs and its character in relation to the public are important factors in determining whether a building is public." This statement was partly based on the law court's prior holding in *Adriance v. Town of Standish*, 687 A.2d 238, 240 (Me. 1996), where it affirmed a Superior Court that held a waste transfer station "falls squarely within the public building exception to sovereign immunity" because "[t]he transfer station is permanent, fully enclosed and completely open to the public. . . ." The *Rodriguez* principle was also partly based on a definition of "public building" taken from Black's Law Dictionary, which states that a public building is "[a] building that is accessible to the public; esp[ecially] one owned by the government." *Rodriguez*, 2007 ME 68, ¶ 32, 922 A.2d 484 (quoting BLACK'S LAW DICTIONARY 1243 (7th ed. 1999)).

In *Rodriguez*, the Law Court held that town clerk's residence was a public building for MTCA purposes because it was used to "provid[e] services to the people on a business basis, was under some degree of civic or state control, and was a place accessible or visible to all members of the communities." *Id.* ¶ 35 (quotations omitted). The Law Court emphasized the fact that the town clerk's home was open to the general public for the conduct of public business when classifying it a public building for MTCA purposes under the specific facts of that case.

5

It is important, however, to read *Rodriguez* in context. In *Rodriguez*, the issue was whether the clerk's private residence could be classified as a public building for MTCA purposes based on the nature of the business conducted there. The Law Court did not focus on the ownership of the building, because it was clear that the building in question was the clerk's private residence. However, the Law Court also emphasized that the town clerk's home was "under some degree of civic or state control." *Id.* ¶ 35. It is also important to note that the Law Court only stated that "the function a building performs and its character in relation to the public" are important factors in determining whether a building is public, it did not say that these were the *only* factors, nor did it state that being open to the general public is a prerequisite to be considered a public building. The *Rodriguez* court was emphasizing the fact that the clerk's private residence was open to the public to show how a privately owned building was actually "public" under those particular facts.

The Law Court has also held that the Portland Police Department Headquarters is a public building because it is "accessible to the public, owned by the City, and serving a public function." *McDonald v. City of Portland*, 2020 ME 119, ¶ 13, 239 A.3d 662.

Defendants argue that the MCC is not a public building because it is not "completely open" to the general public. The court disagrees. While the MCC is not open to the general public to the same degree that a public high school or a waste transfer station might be, it is also not completely closed to the public. *Lightfoot v. Sch. Admin. Dist. No. 35*, 2003 ME 24, ¶ 8, 816 A.2d 63 (public high schools are public buildings under MTCA); *Adriance*, 687 A.2d at 240 (Me. 1996). Approved visitors are allowed inside in certain areas, not unlike a police department. The Law Court has never required that the entire building be open to the public, otherwise the police department at issue in *McDonald* surely would not have been classified a public building.

6

Any member of the general public may enter the police station's lobby, but the evidence locker is surely off-limits.

This is not to say that the court finds that the MCC is completely open to the general public. It clearly is not. The MCC exists in a grey area between being completely open to the general public and being completely closed. The court finds that the MCC falls more on the "closed" side of the spectrum, because all visitors must be pre-approved. In other words, the default is that a member of the general public is not allowed inside, but they may, and often are, granted permission to enter. That said, the court will give some weight to the fact that the MCC is not completely sealed off from the general public and does allow visitors to enter.

Regardless, the court finds that in this case the nature of the business conducted by the MCC is of more importance to its status as a public building under the MTCA than whether it is open to the general public. The MCC incarcerates individuals convicted of crimes based on the length of their criminal sentence and other factors. *See* 17-A M.R.S. § 1252; 34-A M.R.S. §§ 3401-3407. The MCC therefore serves an important "public function" of housing inmates while they serve their sentences. *See McDonald v. City of Portland*, 2020 ME 119, ¶ 13, 239 A.3d 662. The MCC is also owned and operated by the State. The incarceration of prisoners is solely the prerogative of the government, there is no private equivalent.

In fact, the Law Court has suggested that the MCC is a public building before. In *Roberts v. State*, 1999 ME 89, 731 A.2d 855, the Law Court was asked to consider different theories of liability for injuries an inmate at the MCC suffered when the tip of his finger was severed by a cell door. The MTCA was the primary issue in the case. *Id.* The Law Court held, when discussing a theory of negligent maintenance as to the cell door, "[i]f the State had negligently maintained [plaintiff's] cell door and if that negligent maintenance was a significant cause of the

injury to [plaintiff], then the State would have been liable for the injury," implicitly finding that the MCC is a public building under the MTCA. *Id.* ¶ 11.

Considering the function the MCC performs and its character in relation to the public, and in light of *Roberts*, the court finds that the MCC is a public building under the MTCA.

Appurtenance

Having determined that the MCC is a public building, the court now turns to the second question: whether the Runway is an appurtenance to the MCC. "[F]or purposes of section 8104-A(2), an appurtenance is an object or thing that belongs or is attached to a public building." *Sanford v. Town of Shapleigh*, 2004 ME 73, ¶ 10, 850 A.2d 325. In determining whether something "belongs" to a building, the Law Court has required that the object meet the "well-established definition of a fixture" to be treated as an appurtenance. *Searle v. Town of Bucksport*, 2010 ME 89, ¶¶ 13-14, 3 A.3d 390. "A fixture is something that is (1) physically annexed to the realty, (2) adapted to the realty, and (3) intended to be irremovable from the realty." *McDonald*, 2020 ME 119, ¶ 15, 239 A.3d 662.

Two recent cases guide the court's understanding of the appurtenance analysis. In *McDonald*, the Law Court held that a plaza outside the lobby of the Portland Police Department Headquarters was an appurtenance to the Department. *Id.* ¶ 22. The plaza at issue in *McDonald* extends from the entrance of the building to the street and to a parking garage. *Id.* ¶ 2. The plaza was partially open to the sky, but the Department's auditorium also overhangs part of the plaza. *Id.* There is a floor of the Department directly underneath the plaza which was used as a holding pen and a parking area for command staff and an evidence technician truck. *Id.* ¶ 3. The plaza is used by pedestrians to access the Department building, a parking garage, and the street. *Id.* ¶ 4.

8

Department staff also use the plaza to park motorcycles and bicycles and would sometimes eat lunch at picnic tables in the plaza. *Id.*

The Law Court found that this plaza "falls squarely within the definition of a fixture." *Id.* ¶ 16. The Law Court reasoned that the plaza is annexed to the building because it serves as the roof of a portion of the building and cannot be freely moved or relocated. *Id.* As for the second element, the Law Court ruled that the plaza was adapted to the reality because it would not be possible to enter the Department's lobby without it. *Id.* Finally, given how the plaza was annexed to the property and how essential it was to the overall functioning of the building, the Law Court found that the City intended the plaza to be irremovable from the realty.

In *Klein v. Univ. of Me. Sys.*, 2022 ME 17, ¶ 14, 271 A.3d 777, the Law Court found that a parking lot that was continuous with a University of Maine building was not an appurtenance to that building. The Law Court distinguished the parking lot from the plaza in *McDonald* by noting that the parking lot was not "attached" to any of the University buildings and was therefore neither annexed nor irremovable.[4] *Id.* ¶¶ 11-12. Further, the Law Court found that the parking lot was not "unique or integral" to any of the buildings on the college campus. The Law Court held there was "no factual basis upon which to determine that this parking lot serves any special purpose—it does not serve as an entryway to any building, and it has no designated purpose other than parking." *Id.* ¶ 13.

Reading these two cases together, it is clear that the Law Court requires something more than a continuous border to find that something is "attached" to a public building, and therefore

---

[4] The Law Court stated in *Klein*: "Because the parking lot is not annexed to either Holmes Hall or Fogler Library, it cannot be "an irremovable part of the . . . building." Klein, 2022 ME 17, ¶ 12, 271 A.3d 777. The requirement the Law Court is referring to is whether the object is "intended to be irremovable from the realty." McDonald, 2020 ME 119, ¶ 15, 239 A.3d 662 (emphasis added). The Law Court does not discuss the intent of the University in *Klein*, presumably because it reasoned that something not annexed to the property cannot have been intended to be irremovable.

9

annexed to the property, for the purposes of the MTCA. To be attached, the object in question must be affixed to the building or the land in some way. As the precedent relates to this case, being a paved area adjacent to a public building is not enough on its own. *Compare Searle*, 2010 ME 89, ¶¶ 17-23, 3 A.3d 390 (easily-disassembled, generic bleachers were not annexed to the land), *and Sanford*, 2004 ME 73, ¶ 12, 850 A.2d 325 (freestanding trash bin outside of a waste facility building not an appurtenance), *with Rodriguez*, 2007 ME 68, ¶ 28 n.3, 922 A.2d 484 (external stairs leading into a public building fall within the definition of an appurtenance), *and Donovan v. City of Portland*, 2004 ME 70, ¶ 15, 850 A.2d 319 (describing "stairs" as "appurtenances").

The court finds that the Runway satisfies the test for an appurtenance based on the undisputed statements of material fact. First, the Runway is physically annexed to the realty in a more significant way than the parking lot in *Klein*. The Runway is a paved area that is entirely within the perimeter fence of the MCC. While it is not built into the structure of any particular building on the MCC campus to the extent that it serves as the roof of one of the buildings, like the plaza in *McDonald*, the Runway is integrated into the structure of the MCC facility as a whole. The Runway is the throughfare by which inmates and prison personnel move between the prison's main buildings, and without it there would be no way for them to access the chow hall, the dorms, the medical building, or the main building.

In addition, there is no evidence in the record to support an assertion that the pavement could be "freely pulled up and relocated without any effect on . . . any other part of the MCC," as defendants claim. Even if Defendants are correct and the pavement could be removed and reused, which is not supported by any evidence in the record, the fact remains that the Runway is currently the *only* way inmates move between the different buildings in the MCC. Moving

between the various buildings in the MCC is necessary for inmates to eat and receive medical treatment, among other things. It would be far from simple to tear up the Runway and move it elsewhere.

Turning to the second requirement, the Runway is plainly adapted to the unique needs of the MCC. While at the most abstract level, the Runway is essentially a road, in context it serves as the only way for inmates to move around the prison. That restriction is essential to the function of the MCC, as it allows the inmates to be supervised at all times. It is not an exaggeration to say that without the Runway, or something like it, the MCC would not be able to function in its current form.

As for the final requirement, the Runway is intended to be irremovable from the MCC, because without it the inmates would have no means to get to chow hall, the medical building, or the main building without it. Clearly the MCC could not have been designed in such a way that the inmates' sole means of accessing food and medical care was meant to be removable from the realty. The structure and operation of the MCC demonstrates a clear intent for the Runway to remain annexed to the reality permanently.

The Runway meets all three requirements to be considered an appurtenance. In deciding this case, the fact that the MCC is a prison weighs heavily on the court's analysis. Inmates are not free to leave or choose their own path to move around the facility. Their movement through the facility is carefully controlled and supervised by design. The Runway, which facilitates this movement, and by doing so facilitates the operation of the MCC as a whole,[5] is so inextricably

---

[5] The structure of the MCC as a whole distinguishes this case from the line of cases holding that paved blacktop areas adjacent to public buildings are not appurtenances to those public buildings. *See, e.g., Kitchen v. City of Calais*, 666 A.2d 77, 78 (Me. 1995). The Runway is not just a paved area or a walkway, in context, the Runway serves to facilitate the flow of prisoners between the MCC buildings under supervised conditions, which is essential to the operation of the MCC buildings.

linked to the structure and operation of the MCC that it must be characterized as an appurtenance to the MCC buildings. Therefore, as a matter of law, the MTCA does not bar Mr. Rinaldi's claims.

Sovereign Immunity for Federal Claims

Defendants also state that Mr. Rinaldi's two federal claims, Counts XI and XII, are barred by sovereign immunity. Counts XI and XII together allege that Defendants violated the Eighth Amendment's prohibition of cruel and unusual punishment by denying Mr. Rinaldi pain medication for his injuries and seek damages pursuant to 42 U.S.C. § 1983.

"The immunity of the sovereign from suit is one of the highest attributes inherent in the nature of sovereignty." *Bouchard v. Frost*, 2004 ME 9, ¶ 9, 840 A.2d 109 (quoting *Drake v. Smith*, 390 A.2d 541, 543 (Me. 1978)). The doctrine of sovereign immunity, derived from the Eleventh Amendment of the United States Constitution, "precludes the federal courts from circumventing the sovereign immunity of the states. Although the Eleventh Amendment is not directly applicable to state courts, the doctrine of sovereign immunity similarly protects the states from actions of state courts." *Moody v. Comm'r, Dep't of Human Servs.*, 661 A.2d 156, 158 n.3 (Me. 1995). Congress may abrogate the sovereign immunity of the states under specific enumerated powers, but the Federal Courts have ruled that Congress did not intend to abrogate sovereign immunity when passing § 1983. *See Johnson v. Rodriguez*, 943 F.2d 104, 105 (1st Cir. 1991).

The parties agree that Defendants are all state agencies and therefore ordinarily immune from suit. Mr. Rinaldi has not put forth any arguments why the doctrine of sovereign immunity should not apply here. The Eleventh Amendment bars Mr. Rinaldi's § 1983 claims in this case.

The entry is

> Plaintiff Josh Rinaldi's Motion for Summary Judgment is
> GRANTED. Defendants Maine Correctional Center, Maine
> Department of Corrections, and the State of Maine's joint
> Cross-Motion for Summary Judgment is GRANTED as to
> Count XI and Count XII, and DENIED as to the rest.
>
> The Clerk is directed to enter this order into the docket by
> reference pursuant to M.R.Civ.P. 79(a).

Date:   June _15_, 2023

Harold Stewart, II
Justice, Superior Court

13