MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2024 ME 81
Docket:      Ken-23-61
Argued:      December 6, 2023
Decided:     December 26, 2024

Panel:        STANFILL, C.J., and MEAD, HORTON, LAWRENCE, and DOUGLAS, JJ.*
Majority:     STANFILL, C.J., and MEAD, HORTON, and DOUGLAS, JJ.
Concurrence:  LAWRENCE, J.

GOVERNMENT OVERSIGHT COMMITTEE

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES

DOUGLAS, J.

[¶1] This case involves a dispute between the Government Oversight Committee of the 131st Maine Legislature and the Maine Department of Health and Human Services over access to confidential Department records relating to the deaths of four children in 2021. When the Department declined to produce the records in response to a Committee subpoena on the grounds that child protective files are confidential, the Committee filed an action in the Superior Court (Kennebec County) seeking to compel obedience with its subpoena. The court (*Stokes, J.*) issued a judgment denying the Committee's request to compel, and the Committee appealed. We affirm the court's judgment.

---

* Although Justice Jabar participated in this appeal, he retired before this opinion was certified.

## I. BACKGROUND

[¶2]  The Department of Health and Human Services is a cabinet-level agency of Maine's executive branch.  22-A M.R.S. §§ 201, 204 (2024).  Under the Child and Family Services and Child Protection Act, 22 M.R.S. §§ 4001 to 4099-P (2024), the Department is charged with the duty to

> act to protect abused and neglected children and children in circumstances that present a substantial risk of abuse and neglect, to prevent further abuse and neglect, to enhance the welfare of these children and their families and to preserve family life wherever possible.

*Id.* § 4004(2).  By statute, Department records related to child protective cases are "confidential and subject to release only under the conditions [specified in the statute]."  *Id.* § 4008(1).

[¶3]  The Government Oversight Committee is a joint legislative committee established to "oversee program evaluation and government accountability matters."  3 M.R.S. § 992(1) (2024).  The Committee's duties are set out in 3 M.R.S. § 994 (2024) (and discussed below).  One of its enumerated duties is to oversee a nonpartisan, independent legislative office, the Office of Program Evaluation and Government Accountability (OPEGA).  *Id.* § 994(1)-(4). OPEGA was created "for the purpose of providing program evaluation of agencies and programs of State Government."  3 M.R.S. § 991 (2024).

[¶4] In July 2021, after the high-profile deaths of several young children, the Committee directed OPEGA to conduct an immediate review of the child protective services provided by the Department. The scope of the review was divided into three components with staggered reporting dates. OPEGA issued its first report in January 2022, focusing on state and federal oversight of child protective services. OPEGA issued its second report in March 2022, reviewing child protective services investigations and examining "how child safety is protected and the risks to child safety from the point at which alleged child abuse or neglect is reported to [the Department] through the completion of the investigation."

[¶5] Before OPEGA issued its third report on reunification of families after a child is removed from a custodian and planning for children's permanency when the family cannot be reunified, the Committee sought to make a separate inquiry into matters discussed in the previous reports, specifically a "further inquiry" into the deaths of the four children who died in 2021. On August 9, 2022, as part of its "continued oversight of child protective services," the Committee sent a written request to the Department asking it to produce the records pertaining to those children. The letter "recognize[d] that the requested records may contain information directly relevant to current and ongoing criminal proceedings" but stated:

Given our broad oversight responsibilities, we are legislative officials to whom child protective records must be disclosed pursuant to [22 M.R.S. § 4008(3)(D)]. Thus, pursuant to our authority under 3 M.R.S. § 994(11) to directly receive information, we request that you provide us with the complete child protective case files for the [four children in question].

[¶6] The Department, through its Commissioner at the time, Jeanne Lambrew, responded in an August 19, 2022, letter stating that, upon advice of the Office of the Maine Attorney General, the Department was unable to share the requested records directly with the Committee due to statutory confidentiality restrictions, but that it would provide the records to OPEGA as authorized in Title 3. The Committee served a subpoena to produce documents on the Department on September 22, 2022, demanding that the records pertaining to the four children be produced on or before its October 19, 2022, meeting. The Department served an objection to the subpoena, reiterating its position that it could not legally disclose the records to the Committee but could, and would, furnish the requested records to OPEGA.

[¶7] On September 26, 2022, OPEGA made a formal request for the same records that the Committee had subpoenaed. OPEGA sent the Department an executed confidentiality agreement, which required OPEGA, among other things, to store the files "on a server that can be accessed only by OPEGA staff and appropriate staff from the Legislative Information Services Department"

and maintain working papers containing confidential information in locked storage cabinets. The Department subsequently supplied the files to OPEGA pursuant to the confidentiality agreement.

[¶8] On October 21, 2022, the Committee filed a complaint in the Superior Court together with a motion, as required by statute, seeking to compel obedience with the subpoena. *See* 3 M.R.S. § 430 (2024). The Department answered and filed a responsive pleading. The parties submitted briefs and waived oral argument. The trial court concluded that the Committee did not have statutory authority to access confidential Department records, denied the motion to compel, and entered judgment in favor of the Department.

[¶9] The Committee timely appealed. M.R. App. P. 2B(c)(1).

## II. DISCUSSION

[¶10] The Committee challenges on two grounds the trial court's denial of the motion to compel obedience with its subpoena.[1] First, the Committee maintains that the trial court erred in concluding that the Committee was not authorized by its enabling statute, 3 M.R.S. §§ 991-1002 (2024) (the OPEGA

---

[1] The Committee advances a third argument for the first time on appeal, namely that under our decision in *Maine Sugar Industries, Inc. v. Maine Industrial Building Authority*, 264 A.2d 1 (Me. 1970), the Committee has inherent legislative power to compel an executive agency to disclose confidential information via subpoena. The Department objects to our consideration of this issue because it was not raised before the trial court and therefore has not been preserved. We address this issue below. *See infra* ¶¶ 37-45*.*

statute), to receive and review confidential records and information. Second, contrary to the trial court's determination, the Committee argues that the statutory exception in 22 M.R.S. § 4008(3)(D) authorizes disclosure of confidential child protective records.

[¶11]  We review the trial court's interpretation of the relevant statutes de novo. *Ouellette v. Saco River Corridor Comm'n*, 2022 ME 42, ¶ 8, 278 A.3d 1183.  The fundamental objective in interpreting a statute is to determine the Legislature's intent and to give effect to that intent.  *State v. Hastey*, 2018 ME 147, ¶ 23, 196 A.3d 432; *Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 19, 107 A.3d 621; *Pinkham v. Morrill*, 622 A.2d 90, 95 (Me. 1993).  We begin with the statute's language, giving due weight to the overall design, structure, and purpose of the statutory scheme.  *See Dickau*, 2014 ME 158, ¶ 22, 107 A.3d 621.  If the language "is clear and unambiguous, we construe the statute in accordance with its plain meaning"; if the language is ambiguous, we then look to other indicia of legislative intent, including legislative history.  *Adoption by Tamra M.*, 2021 ME 29, ¶ 6, 251 A.3d 311.

## A.    The OPEGA Statute

### 1.    Language, Structure, and Purpose

[¶12]   The OPEGA statute establishes a mechanism of legislative oversight of government agencies and programs that is carried out by OPEGA

and generally overseen by the Committee. Each entity is prescribed a distinct role, and their respective roles inform the nature and scope of access to confidential information and records such as those at issue here.

[¶13]   OPEGA "[was] created for the purpose of providing program evaluation of agencies and programs of State Government."  3 M.R.S. § 991. "'Program evaluation' means an examination of any government program that includes performance audits, management analysis, inspections, operations, research or examinations of efficiency, effectiveness or economy or evaluation of any tax expenditure required under [chapter 37 of Title 3]." 3 M.R.S. § 992(5). Because of the nature and scope of its charge, OPEGA requires, and is afforded, full access to agency records, including confidential information and records. 3 M.R.S. § 997.  The OPEGA statute provides:

> **4. Information available to office.** Upon request of the office[2] and consistent with the conditions and procedures set forth in this section, *state agencies or other entities subject to program evaluation must provide the office access to information that is privileged or confidential as defined by Title 1, chapter 13, which governs public records and proceedings*.

*Id.* (emphasis added).[3]  "Privileged or confidential information obtained by the office during the course of a program evaluation *may be disclosed only as*

---

[2] The "office" referenced throughout the OPEGA statue is OPEGA itself.  3 M.R.S. § 992(3) (2024).

[3] The statute also establishes detailed protocols for protecting those records, and information derived from those records, that are in the possession of OPEGA or reflected in the working papers of

*provided by law and with the agreement of the state agency or other entity subject to the program evaluation that provided the information.*"[4]  *Id.* § 997(4)(B) (emphasis added).

[¶14]  The Committee's statutorily defined role is different from OPEGA's, and so is its specified access to information.  The Committee was established as a "joint legislative committee" to "oversee program evaluation and government accountability matters."  *Id.* § 992(1)  The Committee's specific duties are set out in section 994.[5]  Nothing in section 994 authorizes the Committee to

---

its staff.  For example, even before beginning an evaluation "that may require access to records containing confidential or privileged information," OPEGA must alert the subject agency in writing and consult with agency representatives "to discuss methods of identifying and protecting privileged or confidential information in those records."  3 M.R.S. § 997(4)(A) (2024).  OPEGA must "limit its access" to such information "by appropriate methods, which may include examining records without copying or removing them from the source."  *Id.*

[4]  Even OPEGA's working papers that reflect such confidential information are deemed "confidential and exempt from disclosure pursuant to Title 1, chapter 13, *including disclosure to the Legislative Council or an agent or representative of the Legislative Council.*"  *Id.* § 997(3) (emphasis added); *see also* 3 M.R.S. § 992(7) (2024) (defining "[w]orking paper" as "all documentary and other information acquired, prepared or maintained by the office during the conduct of a program evaluation").

[5]  Title 3 M.R.S. § 994 (2024) specifies that the Committee has the following duties: (1) evaluate, and recommend reappointment of, the director of OPEGA; (2) review and approve OPEGA's annual workplan; (3) direct OPEGA to conduct program evaluations; (3-A) request the State Auditor or other qualified auditor to conduct all or part of a program evaluation when the Committee determines a qualified auditor is required; (4) "hold public hearings *for the purpose of receiving reports from the office and questioning public officials about office findings and recommendations*"; (5) "examine witnesses and . . . order the appearance of any person or the appearance of any person for the purpose of production to the committee of papers or records, including books, accounts, documents, computer disks or memory or other electronic media and other materials regardless of their physical or electronic form"; (6) "administer oaths to witnesses appearing before the committee"; (7) "vote at the committee's discretion to endorse, to endorse in part or to release a report of the office without endorsement"; (8) "issue subpoenas[, which *must be issued pursuant to the provisions of section 165 and chapter 21,*] upon a majority vote of the committee in the event of refusal to appear or to produce papers or records, including books, accounts, documents, computer disks or memory or other

conduct independent investigations, audits, or program evaluations directly. That is OPEGA's function. The Committee directs and oversees OPEGA's work. Although the Committee is authorized to conduct hearings—and to examine witnesses and to order the appearance of persons to testify or produce documents—the hearings are expressly "for the purpose of receiving reports from the office and questioning public officials about office findings and recommendations." 3 M.R.S. § 994(4)-(5).

[¶15] Consistent with the duties it prescribes, the OPEGA statute defines—and limits—the information available to the Committee:

> **11. Information available to committee.** To receive certain information. Information that is made available to the committee is governed by chapter 21, which governs legislative investigating committees, and by Title 1, chapter 13, which governs public records and proceedings.

3 M.R.S. § 994(11). Thus, the Committee may "receive *certain* information" that falls into one of two categories. *Id.* (emphasis added).

[¶16] First, the Committee may "receive" information that is governed by Title 1, chapter 13. Title 1, chapter 13 is the Maine Freedom of Access Act,

---

electronic media and other materials regardless of their physical or electronic form"; (9) "conduct meetings"; (10) "adopt rules"; (11) "*receive certain information*," which "*is governed by chapter 21, which governs legislative investigating committees, and by Title 1, chapter 13, which governs public records and proceedings*"; and (12) establish a system for immediate review of a program or function of a state agency or other entity when major mismanagement of public funds or functions is suspected. (Emphasis added.)

1 M.R.S. §§ 400-414 (2024), which, among other things, defines "public records," that is, records that are accessible to the public. *Id.* § 402(3). "Public records" excludes "[r]ecords that have been designated confidential by statute" and "[r]ecords that would be within the scope of a privilege against discovery or use as evidence recognized by the courts of this State." *Id.* § 402(3)(A)-(B)*.* This signifies a clear intention to authorize the Committee to access only public information or records—that is, information or records available to the public either directly or through public proceedings—and not privileged or confidential information or records.[6]

[¶17] Second, the Committee may receive information "governed by chapter 21" of Title 3.[7] 3 M.R.S. § 994(11). Chapter 21 establishes the rules and

---

[6] As discussed below, *see infra* ¶ 25, the Legislature used the identical language referencing "Title 1, chapter 13" on an earlier occasion when it temporarily removed OPEGA's access to privileged and confidential information and confined OPEGA to accessing publicly available information.

[7] This reference to chapter 21 of Title 3 parallels section 994(8)'s qualification of the Committee's subpoena power. Section 994(8) provides: "A subpoena issued under this subsection must be issued pursuant to the provisions of section 165 and chapter 21." Title 3 M.R.S. § 165 (2024) defines the authority of joint standing committees and joint select committees. As mentioned above, the Committee was established as a "joint legislative committee." 3 M.R.S. § 992(1). As relevant here, section 165(7) provides:

> When the duties assigned to a committee so require, the Legislature may grant to it the power to administer oaths, issue subpoenas, compel the attendance of witnesses and the production of any papers, books, accounts, documents and testimony, and to cause the deposition of witnesses, whether residing within or without the State, to be taken in the manner prescribed by law for taking depositions in civil actions in the Superior Court. When the Legislature grants this power to a joint standing committee or joint select committee, such committee functions as an investigating committee and is subject to the provisions of chapter 21.

procedures applicable to "legislative investigating committees," including, as relevant here, rules regarding the issuance of subpoenas. *See* 3 M.R.S. §§ 411, 423 (2024). A key provision in chapter 21 is section 412, which provides: "The authorization creating an investigating committee shall clearly state, *and thereby limit*, the subject matter and scope of the study or investigation. *No investigating committee shall exceed the limits set forth in such authorization.*" 3 M.R.S. § 412 (2024) (emphasis added).

[¶18] Thus, this imposes another limitation on the nature of the information and records that the Committee may receive, either directly or via subpoena: it may receive only information and records that are relevant to, and within the scope of, the Committee's duties, authority, and purpose. This is consistent with the general principle that a legislative committee's authority to subpoena records is co-extensive with, and cannot exceed, the proper scope of the committee's legislatively prescribed duties. *See Me. Sugar Indus., Inc. v. Me. Indus. Bldg. Auth.*, 264 A.2d 1, 7 (Me. 1970) (stating that "it is to be presumed that the Legislature is concerned only with matters within the proper scope of investigation"); *cf. Trump v. Mazars USA, LLP*, 591 U.S. 848, 862-63 (2020)

---

Here, the Committee has been granted the power to order the appearance of any person, administer oaths, and issue subpoenas in the event of a refusal to appear or produce documents. 3 M.R.S. § 994(5)-(6), (8). It does not appear that the OPEGA statute grants the Committee the authority to conduct depositions.

("Most importantly, a congressional subpoena is valid only if it is related to, and in furtherance of, a legitimate task of the Congress." (quotation marks omitted)). A subpoena must serve a "valid legislative purpose." *Quinn v. United States*, 349 U.S. 155, 161 (1955).

[¶19] The OPEGA statute's plain language, structure, and purpose creates a clear division of roles between OPEGA and the Committee; their respective access to agency records and information follows from that division of roles. Notwithstanding the Committee's authority to subpoena witnesses and records, section 994(11) appears to prohibit it from accessing confidential information generally. To the extent this remains ambiguous, the legislative history of the OPEGA statute confirms this conclusion.

## 2. Legislative History

[¶20] In 2002, a bill, L.D. 2193 (120th Legis. 2002), was introduced to establish a mechanism to evaluate and audit state agencies and programs. As originally proposed, the bill established both OPEGA and the Committee but purported to give the Committee itself direct involvement in program evaluations and reviews. *See id.* at 1 ("The Joint Legislative Oversight Committee . . . is created for the purpose of providing program evaluation of agencies and programs of State government.").

[¶21]  L.D. 2193 was controversial.  Numerous concerns were raised, including fears about the potential for partisan abuse, worries about unfettered access to privileged or confidential data, and a perception that the public may lack confidence in a process that could be viewed as overly political.  *See* 3 Legis. Rec. S-1923 to S-1924, S-1992 to S-2000 (2d Reg. Sess. 2002).  In response, the bill was amended twice and was the subject of several floor debates, during which proponents sought to alleviate the concerns.  *Id.*; Comm. Amend A to L.D. 2193, No. H-1039 (120th Legis. 2009); Sen. Amend. C to Comm. Amend. A to L.D. 2193, No. S-595 (120th Legis. 2009).

[¶22]  For example, one of the proponents, Senator Pendleton, assured the Senate that in one of the amendments, "[W]e wanted an oversight committee but we also wanted an office with a purpose, to serve as an information gathering office for the entire legislature."  3 Legis. Rec. S-1993 (2d Reg. Sess. 2002).  Senator Pendleton added, "We thought that in order for this office to function efficiently, it needs to be as far away from the perception of any kind of partisan politics to the public and also to those bureaus, programs, or entities that were being examined."  *Id.*

[¶23]  Another proponent, Senator Youngblood, said:

No committee person, no legislator, would be involved based on this present legislation.  They would never be involved in doing that research.  No legislator would be involved in doing that research.

Elected officials oversee this function. . . . There are all those safeguards in it.

*Id.* at S-1998.  Later, he again emphasized:

No legislator has the ability to go out and get involved in any research. *No legislator has the ability to review the data that is being researched and influence the report prior to the report being given back to the committee.  The committee then has the ability and the statutory authorization to accept the report, to deny the report, or to accept it in part.* . . . The day that this report is made available to that committee it is made available to each and every one of us and the general public.  That's the only way that you have the total perception by the consuming public, by the people who sent us here, that this is a non-biased, believable[ ] report.

*Id.* at S-1999 (emphasis added).

[¶24]  Responding to a specific concern raised about the confidentiality of records and data, Senator Youngblood acknowledged that confidentiality was a "big concern" but assured his colleagues that the bill was written with specific provisions pertaining to the confidentiality of records and working papers of OPEGA.  *Id.* at S-1998 to S-1999.

[¶25]  The legislation enacted later that session, as amended, did not include the originally proposed provisions authorizing the Committee to have direct involvement in program evaluations;[8] established essentially the same

---

8  As amended and finally enacted, 3 M.R.S.A. § 991 (Supp. 2002) read essentially as it does currently: "The Office of Program Evaluation and Government Accountability is created for the purpose of providing program evaluation of agencies and programs of State Government."  P.L. 2001, ch. 702, § 2 (effective July 25, 2002).

oversight functions and duties for the Committee that are currently reflected in 3 M.R.S. § 994(1)-(10); and included a provision substantively identical to the current section 997(4), giving OPEGA access to privileged and confidential information held by governmental entities:

> **4. Information available to the office.** Notwithstanding any other law relating to the confidentiality of information, all information in the files of a state agency or other entity subject to program evaluation by the office under this chapter must be made available when necessary to the office for performance of its duties.

P.L. 2001, ch. 702, § 2 (effective July 25, 2002).

[¶26] Nonetheless, concerns persisted about giving even OPEGA unfettered access to agency-held confidential information and records. The following year, the Legislature amended section 997(4) to remove OPEGA's authority to access confidential information in the possession of state agencies without consent and instead restricted OPEGA to information and records publicly available under FOAA:

> **4. Information available to the office.** ~~Notwithstanding any other law relating to the confidentiality of information, all information in the files of a state agency or other entity subject to program evaluation by the office under this chapter must be made available when necessary to the office for performance of its duties.~~ <u>Information that is made available to the office is governed by chapter 21, which governs legislative investigating committees, and by Title 1, chapter 13, which governs public records and proceedings.</u>

P.L. 2003, ch. 451, § KKK-4 (emergency, effective June 12, 2003); *see also* 3 M.R.S. § 997(4)(C).

[¶27]  Because this change was controversial, another provision was enacted at the same time requiring that the Committee review and determine the kind of confidential information required  "to fulfill the purposes set forth in [the OPEGA statute]" and then to "report its findings and recommendations, together with any necessary proposed implementing legislation, to the Second Regular Session of the 121st Legislature."  P.L. 2003, ch. 451, § KKK-5 (emergency, effective June 12, 2003).

[¶28]  The Committee apparently followed up on this charge.  In 2004, the Legislature amended section 997(4) to restore OPEGA's access to agency-held confidential records. P.L. 2003, ch. 673, § GGGG-9 (effective July 30, 2004).  The amendment was paired with the addition of a new provision—section 994(11)—limiting the Committee's access to confidential information. P.L. 2003, ch. 673, § GGGG-7 (effective July 30, 2004).  The newly added section 994(11) restricted the information that could be received by or made available to the Committee to information "governed by chapter 21, which governs legislative investigating committees, and by Title 1, chapter 13, which governs public records and proceedings."  The same language that had been used to remove OPEGA's ability to access confidential records was used to define (and

limit) the information accessible by the Committee. *Compare* P.L. 2003, ch. 451, §§ KKK-4 (emergency, effective June 12, 2003), *with* P.L. 2003, ch. 673, § GGGG-7 (effective July 30, 2004).

[¶29] In an April 2004 floor address, Senator Youngblood stressed the importance of the amendment restoring OPEGA's access to confidential records while simultaneously restricting access to all legislators: "It clarifies an area of confidentiality. I've said before in this chamber and I'll say it again, *this committee, this legislature, with these changes in that particular piece of statute, does not give any of us any ability to get at confidential information*." 3 Legis Rec. S-1665 (2d Spec. Sess. 2004) (emphasis added).

[¶30] Section 994(11) has remained unchanged since its enactment in 2004. This is especially significant in light of two additional considerations.

[¶31] First, the following year, in 2005, a controversy arose like the one at issue here. The Committee sought direct access to the Department's confidential child protective records. *See* Op. Me. Att'y Gen. 2005-06. Then Attorney General G. Steven Rowe issued an advisory opinion in which he opined that the OPEGA statute set out "different standards applicable to the Committee, as distinguished from those applicable to the OPEGA staff," and, citing section 994(11), concluded that "records that are confidential under [Title 1, chapter 13] are not available to the Committee." *Id.* at 3. Though the opinion of the

Attorney General was not binding, it put the Committee on notice of the very issue raised in this appeal. Yet, in the twenty intervening years, the Legislature has taken no action to amend or clarify section 994(11)—at least until recently.

[¶32] Second, in the First Regular Session and First Special Session of the 131st Legislature, three bills were introduced to expand section 994(11) to expressly authorize the Committee to access confidential information. *See* L.D. 1195 (131st Legis. 2023); L.D. 1275 (131st Legis. 2023); L.D. 1725 (131st Legis. 2023). L.D. 1195 proposed to amend section 994(11) to authorize the Committee "[t]o receive papers or records received as a result of a subpoena" and to designate those papers or records as confidential. L.D. 1275 proposed to amend section 994(11) to specifically authorize the Committee "[t]o receive documents from the Department of Health and Human Services relating to an investigation of the death of a child with previous department involvement" and to designate such documents as confidential. And L.D. 1725 proposed to amend section 994(11) to expressly authorize the Committee to receive "information and records, including information and records that are otherwise privileged or confidential." None of these bills was enacted.

## B.  Exception under 22 M.R.S. § 4008(3)(D)

[¶33] Section 4008(1) of Title 22 provides:

> **1. Confidentiality of records and information.** All department records that contain personally identifying information and are created or obtained in connection with the department's child protective activities and activities related to a child while in the care or custody of the department, and all information contained in those records, are confidential and subject to release only under the conditions of subsections 2 and 3.

The Committee acknowledges that the records it subpoenaed fall within, and are protected by, section 4008(1). It contends, however, that a provision in section 4008(3)(D) is an exception to the general rule of confidentiality that mandates disclosure here. Section 4008(3)(D) provides:

> **3. Mandatory disclosure of records.** The department shall disclose relevant information in the records to the following persons:
>
> . . . .
>
> **D.** An appropriate state executive or legislative official with responsibility for child protection services, provided that no personally identifying information may be made available unless necessary to that official's functions.

The Committee argues that its members are "legislative officials with responsibility for child protection services." We find this argument unpersuasive.

[¶34] Under a plain reading of section 4008(3)(D), the Committee itself would not be considered a "legislative official." Nor does the Committee have "responsibility for child protection services." Its duties are set out in

section 992, as discussed above. Strictly speaking, individual Committee members are elected legislators, not "legislative officials." And even if they could be considered "legislative officials," individual Committee members do not have "responsibility for child protection services" in their capacity as members of the Committee. The Committee's general oversight responsibility to ensure that state programs are being properly administered is fundamentally different than having specific "responsibility for child protection services." *Id.* The Committee's function is "to oversee program evaluation and government accountability matters," 3 M.R.S. § 992(1), and to direct OPEGA, *id.* § 994(3)— not to exercise responsibility for child protection services.

[¶35] Even if section 4008(3)(D) were ambiguous, it is not sufficiently clear that the Committee's reading is supportable. When a statute's language is ambiguous, we "consider the statute's meaning in light of its legislative history and other indicia of legislative intent." *Hastey*, 2018 ME 147, ¶ 23, 196 A.3d 432. Section 4008(3)(D) was enacted in 1980, P.L. 1979, ch. 733, § 18 (effective July 3, 1980), well before the OPEGA statute was enacted. Clearly, at the time it was enacted, section 4008(3)(D) was not intended to apply specifically to this Committee or its members. Moreover, when viewed against the backdrop of the Committee's function and the limitations imposed on information that may be

"received" by the Committee, we cannot conclude that it is properly read now to mandate Committee access to confidential child protective files.

[¶36]  Thus, taking into consideration its plain language and history as well as the context of the statutory framework as a whole, we conclude that the exception in section 4008(3)(D) does not operate to mandate disclosure to the Committee of the records at issue here. [9]

## C.  Inherent Authority under *Maine Sugar*

[¶37]  The Committee, citing our decision in *Maine Sugar Industries, Inc. v. Maine Industrial Building Authority*, 264 A.2d 1 (Me. 1970), raises for the first time on appeal the argument that it has inherent power to compel the Department to disclose confidential information via subpoena.  The Department objects to our consideration of this issue because it has not been preserved.

---

[9]  The Committee cites another statutory exception to the confidentiality of child protective records in 22 M.R.S. § 4008 (2024)—namely, subsection 3(I)—as a basis for its access.  Section 4008(3)(I) mandates disclosure to a "government entity that needs such information in order to carry out its responsibilities under law to protect children from abuse and neglect."  The plain language of this provision does not support the Committee's argument.  It is a stretch to believe that the Legislature would consider or reference one of its committees as a "government entity" without being more specific.  Even if the Committee is included within that generic term, neither the Committee as a whole nor its individual members have specific "responsibilities under law to protect children from abuse and neglect." *Id.*  Again, the duties of the Committee are expressly set out in the statute, 3 M.R.S. § 994, and those duties do not include protection of children from abuse or neglect.  We find more persuasive the Department's interpretation of section 4008(3)(I), namely that it is intended to facilitate sharing of child-specific information among governmental entities responsible for the day-to-day enforcement of child protection laws.

[¶38]  Generally, we do not entertain issues on appeal that have not been raised before the trial court.  *See Warren Const. Grp., LLC v. Reis*, 2016 ME 11, ¶ 9, 130 A.3d 969 (reaffirming that "unless a fundamental liberty interest is at stake, we will not reach an issue that is raised for the first time on appeal"); Alexander, *Maine Appellate Practice* § 403(a) at 240 (6th ed. 2022); *see also Teel v. Colson*, 396 A.2d 529, 534 (Me. 1979) ("It is a well settled universal rule of appellate procedure that a case will not be reviewed by an appellate court on a theory different from that on which it was tried in the court below.").

[¶39]  The Committee acknowledges that this issue is unpreserved but contends that we have discretion in an "appropriate situation," *Scott v. Lipman & Katz, P.A.*, 648 A.2d 969, 974 (Me. 1994), and urges us to entertain the issue, citing *Truman v. Browne*, 2001 ME 182, ¶ 12, 788 A.2d 168 (holding that we may consider an unpreserved issue if "it is purely legal, its resolution does not require the introduction of additional facts, its proper resolution is clear, and a failure to consider it may result in a miscarriage of justice").  Here, the issue is purely a legal one; it requires no factual development beyond the existing record; and its resolution seems clear.  In addition, this matter involves a dispute between two branches of government, and "when institutional interests are at stake, the case for the favorable exercise of a court's discretion is strengthened, and waiver rules ought not to be applied inflexibly."  *Nat'l Ass'n of*

*Soc. Workers v. Harwood*, 69 F.3d 622, 628 (1st Cir. 1995). We therefore consider the issue.

[¶40] In *Maine Sugar*, the issue presented to us was whether an ad hoc, "special interim legislative committee" with subpoena power was authorized to access documents that were protected by a general confidentiality statute. 264 A.2d at 2-4. This special interim legislative committee was formed for the sole purpose of investigating a crisis that concerned the insuring of industrial loans and threatened the stability of the northern Maine economy. *Id.* We concluded that the confidentiality statute in that case[10] "must be construed as prohibiting voluntary disclosure . . . but not as prohibiting mandatory disclosure . . . when required by the [special interim legislative committee]." *Id*. at 6.

[¶41] The Committee reads *Maine Sugar* as holding that legislative investigating committees have inherent authority to access confidential information unless there is an explicit statutory prohibition against such access. The Committee argues that, like the confidentiality statute at issue in *Maine Sugar*, 22 M.R.S. § 4008 does not explicitly bar disclosure of the Department's

---

[10] The confidentiality statute at issue in *Maine Sugar*, read, in relevant part, "No member of the authority, agent or employee thereof shall divulge or disclose any information obtained from the records and files or by virtue of such person's office concerning the name of any lessee or tenant or information supplied by any lessee, tenant, mortgagee or local development corporation in support of an application for mortgage insurance." 10 M.R.S.A. § 852 (Supp. 1970) (repealed and replaced by P.L. 1981, ch. 476, § 1 (effective Oct. 1, 1981)).

confidential records via legislative subpoena, and, therefore, the Committee retains its inherent authority to access the records.

[¶42] *Maine Sugar* does not support the Committee's position. In that case, we "presumed" that the special interim legislative committee in *Maine Sugar* was "concerned only with matters within the proper scope of investigation," but that is not so here. 264 A.2d at 7. As we discussed above, the Committee's duties do not include conducting program evaluations or overseeing child protective services. Reviewing child protective records is therefore not within the scope of the Committee's duties. Moreover, the issue in *Maine Sugar* was the effect of a general confidentiality statute on the special interim legislative committee's access to confidential information; there was no statute specifically limiting the committee's access. Here, not only are child protective records confidential by a statute of general applicability, 22 M.R.S. § 4008, but the Committee is specifically prohibited by its enabling legislation from receiving privileged or confidential records or information, 3 M.R.S. § 994(11).

[¶43] While the appeal in *Maine Sugar* was pending, the Legislature amended the statute at issue, 10 M.R.S.A. § 852 (Supp. 1970), to make clear its intention that the special interim legislative committee have access to the confidential information the committee was seeking. 264 A.2d at 4; *see* P.L.

1969, ch. 584, § 1 (effective May 9, 1970) ("Nothing in [section 852] shall be construed to prohibit the disclosure of information from records or files of the authority or the production of records or files of the authority to a special interim legislative investigating committee, or its agent, upon written demand from the chairman of the committee or any member of the committee designated by him."). Here, as noted above, the Legislature considered clarifying the Committee's authority to allow it to receive confidential child protective records but did not do so.

[¶44] In *Maine Sugar*, we deemed access to the records to be necessary for the special interim legislative committee to do its work because "'[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" 264 A.2d at 6 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)). Here, the OPEGA statute contemplates that the Committee (and, simultaneously, the Legislature) is "fully informed" when it receives a report from OPEGA.[11] *Id.* Although the Committee may seek supplemental information in connection with a report, the "legislative body," i.e., the Legislature, has chosen to limit the scope of information that it may "receive."

---

[11] At the time the Committee made its request for the records in this case, OPEGA staff were "well into deeply reviewing every document [and] every report."

*Id.* (quoting *McGrain*, 273 U.S. at 175). Thus, the "legislative body" is not precluded from "legislat[ing] wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Id.* (quoting *McGrain*, 273 U.S. at 175).

[¶45] In short, unlike the circumstances in *Maine Sugar*, the Committee's authority to access confidential child protective records is limited by the scope of its statutorily prescribed duties and by the class of information that it may receive.

### III. CONCLUSION

[¶46] The Legislature controls the authority and functioning of its own committees. For the reasons set out above, we conclude that the Legislature has determined the role of the Committee in the scheme of governmental oversight and review as well as the information available to it in that process. It is free to clarify or change the Committee's role, the scope of its authority, and the nature of the information believed necessary for the Committee to carry out its work.

The entry is:

Judgment affirmed.

LAWRENCE, J., concurring.

[¶47] I agree with the Court's determination that the Committee was not entitled to the confidential records at the time of its subpoena. Where I part ways with the Court's opinion is that it goes too far in concluding that the Committee is never authorized to seek and, if necessary, demand the production of confidential information like the Department's child protective records.

[¶48] "The fundamental objective in interpreting statutes is to determine the intent of the Legislature in enacting them and to give effect to that intent." *Pinkham v. Morrill*, 622 A.2d 90, 95 (Me. 1993). We interpret a statute's language "to avoid absurd, illogical, or inconsistent results and attempt[] to give all of its words meaning." *Jackson Lumber & Millwork Co., Inc. v. Rockwell Homes, LLC*, 2022 ME 4, ¶ 10, 266 A.3d 288. As a general rule, words and phrases that are not expressly defined in a statute "must be given their plain and natural meaning and should be construed according to their natural import in common and approved usage." *Goodine v. State*, 468 A.2d 1002, 1004 (Me. 1983); *see also* 1 M.R.S. § 72(3) (2024) ("Words and phrases shall be construed according to the common meaning of the language.").

[¶49] This Court looks to dictionary definitions to help determine the ordinary meaning of words in a statute. *See, e.g.*, *Searle v. Town of Bucksport*, 2010 ME 89, ¶¶ 8-10, 3 A.3d 390. In looking for the plain meaning, we view

"the relevant provisions in the context of the entire statutory scheme to generate a harmonious result." *Corinth Pellets, LLC v. Arch Specialty Ins. Co.*, 2021 ME 10, ¶ 19, 246 A.3d 586 (quotation marks omitted). This Court "*should not read a statute to conflict with another statute when an alternative, reasonable interpretation yields harmony.*" *Pinkham*, 622 A.2d at 95 (emphasis added).

[¶50] If a statute is unambiguous, "we interpret the statute directly *without examining legislative history*. We look to legislative history and other extraneous aids in interpretation of a statute *only when we have determined that the statute is ambiguous*," meaning that it "is reasonably susceptible to different interpretations." *Thurston v. Galvin*, 2014 ME 76, ¶ 13, 94 A.3d 16 (emphasis added) (quotation marks omitted).

[¶51] As the Court's opinion states, OPEGA was created "for the purpose of providing program evaluation of agencies and programs of State Government." 3 M.R.S. § 991 (2024). Because of the nature and scope of its charge, OPEGA requires, and is afforded, full access to agency records, including confidential information. 3 M.R.S. § 997(4) (2024).

[¶52] The Committee was established as a "joint legislative committee" to "oversee program evaluation and government accountability *matters*."[12]

---

[12] The Committee is a bipartisan joint legislative committee, composed of an equal number of members from the two largest political parties in each chamber of the Legislature. Joint Rule 371 (131st Legis.).

3 M.R.S. § 992(1) (2024) (emphasis added). The Committee directs and oversees OPEGA's work pursuant to the provisions of the Committee's enabling statute, 3 M.R.S. § 994 (2024).[13] Black's Law Dictionary defines "matter" as "[a] subject under consideration." *Matter*, Black's Law Dictionary (12th ed. 2024). Here, the subject under consideration is the deaths of four children who received child protective services from the Department. Therefore, the Committee's role is to oversee OPEGA's investigation into the deaths of these four children.

[¶53] The Committee is not authorized to conduct independent investigations, audits, or program evaluations directly. However, given the plain

---

[13] Title 3 M.R.S. § 994 (2024) specifies that the Committee has, inter alia, the following duties: to review and approve OPEGA's annual workplan; to direct OPEGA to conduct program evaluations; "[t]o hold public hearings *for the purpose of receiving reports from [OPEGA] and questioning public officials about [OPEGA's] findings and recommendations*"; "[t]o examine witnesses and to order the appearance of any person or *the appearance of any person for the purpose of production to the [C]ommittee of papers or records, including books, accounts, documents, computer disks or memory or other electronic media and other materials regardless of their physical or electronic form*"; to administer oaths to witnesses appearing before the Committee; *"[t]o vote at the [C]ommittee's discretion to endorse, to endorse in part or to release a report of [OPEGA] without endorsement"*; *"[t]o issue subpoenas* [pursuant to the provisions of section 165 and chapter 21] *upon a majority vote of the [C]ommittee in the event of refusal to appear or to produce papers or records, including books, accounts, documents, computer disks or memory or other electronic media and other materials regardless of their physical or electronic form*"; to conduct meetings; to adopt rules; "[t]o *receive certain information* [in accordance with] *chapter 21, which governs legislative investigating committees, and . . . Title 1, chapter 13, which governs public records and proceedings*"; and "[t]o establish a system to provide immediate review of a program or function of a state agency or other entity [when] major mismanagement of public funds or functions" is suspected.

(Emphasis added.)

30

language and context of the statutory scheme, this lack of authorization does not preclude the Committee from accessing confidential information pursuant to its statutory duties set out in section 994.

[¶54]  Section 994 provides that the information available to the Committee is governed by (a) the Rules for Legislative Investigations, Title 3, chapter 21, and (b) the Freedom of Access Act (FOAA), Title 1, chapter 13. 3 M.R.S. § 994(11).  The Rules for Legislative Investigations expressly provide for a legislative committee to be granted the power to "issue subpoenas . . . in connection *with any study or investigation*," *see* 3 M.R.S. § 411 (2024) (emphasis added),[14] for a committee granted subpoena power to be deemed an "investigating committee," 3 M.R.S. § 402(4) (2024), and for an investigating committee to utilize an "executive session" to exclude the public from that session and the discussion of confidential matters, *id.* § 402(2).  As a legislative

---

[14]  Under Title 3, chapter 37, the Committee alone determines the subject matter and scope of the evaluations and investigations conducted by OPEGA.  3 M.R.S. § 994(3); 3 M.R.S. § 992(1).  *See also* 3 M.R.S. § 412 (2024) ("The authorization creating an investigating committee shall clearly state, and thereby limit, the subject matter and scope of the study or investigation.").  Here, in July 2021, after four children died despite the Department's involvement, the Committee directed OPEGA to conduct an immediate review of the Department's child protective services.  OPEGA developed a three-phase comprehensive review plan to evaluate the adequacy and effectiveness of the child protective services provided by the Department.  In August 2021, the Committee approved the scope of the work in the review of child protective services to include the following:

- An Information Brief on Oversight of Child Protective Services due by January 2022;
- An Evaluation Report on Protecting Child Safety – Initial Investigation and Assessment due by March 2022; and
- An Evaluation Report on Protecting Child Safety – Reunification and Permanency due by September 2022.

committee granted subpoena power, the Committee thus has the power to hold executive sessions to discuss confidential matters.

[¶55]  FOAA governs the information available to the Committee via its subpoena power.  3 M.R.S. § 994(11).  FOAA sets forth that it is the intent of the Legislature that its actions be taken openly, and that the records related to those public proceedings be open to public inspection.  1 M.R.S. § 401 (2024).  But FOAA also makes clear that executive sessions are permitted in order to allow for private "[d]iscussions of information contained in records made, maintained or received by a body or agency when access by the general public to those records is prohibited by statute."  1 M.R.S. §§ 401, 405(6)(F) (2024).  FOAA also defines *both* "public records," 1 M.R.S. § 402(3) (2024), *and* "confidential and privileged records," 1 M.R.S. § 402(3)(A), (B), demonstrating that "records" may refer to both public and confidential records.  Thus, it is clear that the Committee may exercise its subpoena power with respect to both public and confidential information.  Therefore, contrary to the contention in the Court's opinion, the plain language of FOAA does not expressly preclude the Committee from accessing confidential information,[15] and the Rules for Legislative

---

[15]  The Court's opinion, like the trial court's opinion, points to the 2005 Opinion of the Attorney General, which concluded that 3 M.R.S. § 994(11) does not permit confidential records to be shared with the Committee.  As we have repeatedly observed, even our own advisory opinions have no precedential value or conclusive effect.  *See, e.g.*, *Op. of the Justices*, 2017 ME 100, ¶ 9, 162 A. 2d 188.  This is the norm where advisory opinions are issued by a state's highest court.  *See Irons v. R.I. Ethics*

32

Investigations specifically contemplate this possibility by allowing for executive sessions to discuss confidential matters.

[¶56] In performing its duties relative to receipt of OPEGA's reports, the Committee has the authority to conduct hearings. 3 M.R.S. § 994(4)-(8). With respect to those hearings, the Committee may seek information and the production of "papers or records, including books, accounts, documents, computer disks or memory or other electronic media and other materials regardless of their physical or electronic form," 3 M.R.S. § 994(5), and nothing in this portion of the enabling statute expressly precludes the Committee's pursuit of confidential information. Moreover, if information sought by the Committee is not provided, the Committee may issue a subpoena for the production of that information.[16] 3 M.R.S. § 165(7) (2024); 3 M.R.S. § 423 (2024); 3 M.R.S. § 994(8), (11). Again, nothing in the statutes pertaining to the

---

*Comm'n*, 973 A.2d 1124 n.15 (R.I. 2009). Similarly, we are not bound by an advisory opinion of the Attorney General. *See Stewart Title Guaranty Co. v. State Tax Assessor*, 2009 ME 8, ¶ 19, 963 A.2d 169. *See also Swepi, LP v. Mora Cnty.*, 81 F.Supp. 3d 1075, 1193 (2015) (stating that attorney general advisory opinions and letters do not have the force of law). The 2005 Opinion of the Attorney General therefore has no precedential value and its conclusion regarding the Committee's access to the Department's confidential records need not be accorded any weight for the purposes of the matter before us. Further, it is not unusual, as occurred here before the court, for the Office of the Attorney General to actually take opposing positions on policy and litigation. *Cf. Op. of the Justices*, 2015 ME 27, ¶ 23 n.3, 112 A.3d 926.

[16] The Committee cannot issue a subpoena unless there is a majority vote of its members in favor of doing so. 3 M.R.S. § 994(8).

Committee's authority to issue a subpoena precludes the use of the subpoena to obtain confidential information.

[¶57] Seeking the child protective records to facilitate its determinations in regard to OPEGA's report would be entirely consistent with the Committee's enabling statute. Such information may be needed for the Committee to "question[] public officials about [OPEGA's] findings and recommendations" per section 994(4) or to determine whether to endorse OPEGA's recommendations per section 994(7). Such a request would allow the Committee to act on its statutory duties and thus would not constitute an independent evaluation of the Department's child protective services by the Committee.

[¶58] The Committee's pursuit of confidential information in this limited context would be more in line with the statutory posture of the legislative investigating committee in *Maine Sugar Industries, Inc. v. Maine Industrial Building Authority*, 264 A.2d 1 (Me. 1970). Both matters involve a legitimate investigation into a subject matter clearly within the remit of the respective legislative committees. *See id.* at 3-4. Although the Committee cannot conduct its own investigation, the Committee, like the one in *Maine Sugar*, has subpoena power that it may use to obtain confidential information in order to meet its legislative duties. *See id.* at 4. In both instances, the subpoena serves a

legitimate legislative duty—in *Maine Sugar*, it was the direct pursuit of an investigation, and here, it is the prudent exercise of discretion to review OPEGA's report, determine whether or to what degree to endorse it, and decide whether to propose legislation to implement OPEGA's recommendations. *See* 3 M.R.S. § 994(4), (7). Further, as was true of 10 M.R.S.A. § 852 (Supp. 1970) in *Maine Sugar*,[17] the statute here that purportedly bars the Committee's access to confidential information, 22 M.R.S. § 4008 (2024), does not do so expressly.[18]

---

[17] The Court's opinion notes that, during the pendency of the appeal in *Maine Sugar*, the Legislature passed an amendment to the statute at issue, 10 M.R.S.A. § 852 (Supp. 1970). This amendment made the confidential information shielded by the statute subject to disclosure to a special interim legislative investigative committee pursuant to a subpoena issued by the committee upon a future effective date. The Court's opinion concludes that the amendment therefore made clear the Legislature's ultimate intent on the disclosure of the information to the Committee. The *Maine Sugar* Court, however, explicitly set forth that its conclusion that section 852 did not prohibit mandatory disclosure of the confidential information in response to the legislative committee's subpoena was its interpretation of the statute (a) as it stood prior to the amendment and (b) independent of the construct of the amendment on its future effective date. *Me. Sugar,* 264 A.2d at 6.

The Court's opinion suggests that, notwithstanding the statute's language, *Maine Sugar* requires a balancing test to determine whether access should be afforded to the Committee, and that in this matter that test would lead to the denial of access. Here, the deaths within a three-month span of four children whose families had been involved with the Department heightened concerns for the safety of Maine children and highlighted the need for legislative intervention to address potential systemic issues in the provision of child welfare services. The Committee therefore directed OPEGA to immediately perform an evaluation of the Department's provision of child protective services. As that evaluation proceeds, the Committee reasonably could conclude that examination of the Department's case records is needed in order to fulfill its duty to get to the root causes of these child welfare issues and to fashion an appropriate legislative solution for what is discovered. Moreover, section 4008 makes clear that (a) the Department's confidential records may be used only for the purposes for which the release was intended, and (b) the knowing dissemination of the confidential records is a Class E crime. 22 M.R.S. § 4008(1), (4). On these facts, the result of a balancing test is not necessarily the foregone conclusion that the Court's opinion suggests.

[18] In response to section 4008's lack of an express bar on the Committee's access to the Department's case records, the Court's opinion narrowly construes statutory exceptions to FOAA to conclude that none of the exceptions set forth in section 4008 justify disclosure to the Committee. But, as argued *supra* n.17, under the *Maine Sugar* balancing test that contention is at best uncertain. Moreover, the Court's contention may be entirely misplaced under a plain reading of the language in

[¶59]  Fundamentally, the Court's opinion contends that the language in 22 M.R.S. § 4008(3)(D) is so awkwardly phrased it cannot be read to refer to the Committee.  Given the usual and customary way that the Legislature organizes itself to do its work, however, it is entirely logical, unsurprising, and within the plain meaning of section 4008(3)(D) that the members of the Committee fall within the ambit of this provision.  The Committee has clear authority over this substantive area of law as a result of the evaluation of child protective services conducted at the Committee's behest.  Similarly, although its authority is subject to durational limits[19]—by directing, overseeing, and reviewing an evaluation of the adequacy and effectiveness of child protective services; determining whether to endorse the report on the evaluation; and exercising discretion over whether to propose legislation to implement the findings and recommendations from the report on the evaluation of the Department—the Committee has actual, specific, and unambiguous statutory responsibility for the provision of child protective services in the immediate circumstances

---

section 4008(3)(D) that interprets the language so as to avoid absurd, illogical, or inconsistent results; give all of the words meaning; and view it in the context of the entire statutory scheme so as to generate a harmonious result.

[19]  The Committee's authority is durationally limited due to the unique way that the Committee's enabling statute delegates selective legislative authority to it.  *See* 3 M.R.S. §§ 991, 994.  Notably, this self-determined "targeted-task" authority exercised by the Committee in the discretion afforded to it through its enabling statute is not unlike the express "targeted-task" authority delegated to the "Special Interim Legislative Committee" in *Maine Sugar*.  *Me. Sugar*, 264 A.2d at 3-4.

before this Court.[20]  Therefore, each member of the Committee literally meets and satisfies the plain meaning of the words "[a] legislative official with responsibility for child protective services" as set forth in 22 M.R.S. § 4008(3)(D), thus mandating disclosure to the Committee, consistent with its enabling statute.[21]

[¶60]  It is therefore axiomatic that the Committee constitutes a body of legislative officials that could need the Department's confidential information to carry out its responsibilities to protect children from abuse and neglect.  "It is the proper duty of a [legislative] body to look diligently into every affair of government . . . . It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents.  Unless [the Legislature] ha[s] and use[s] every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the [state] must be helpless to learn

---

[20]  Interestingly, OPEGA's report on child protective services, as a part of the legislative oversight of child protective services, notes two areas for further consideration by the Committee in regard to the child protective services system: (i) the provision of services for children and families in the system and (ii) the prevention of child abuse and neglect in the context of giving attention to the three levels of prevention identified by the experts.

[21]  This analysis is equally applicable to section 4008(3)(I), which mandates access to confidential information held by the Department for "any [state] government[al] entity" or agent of such an entity that needs such information in order to carry out its responsibilities under law to protect children from abuse and neglect.  Based on the plain meaning of this language, the Committee constitutes a state governmental entity and thus each member of the Committee is an agent of a state governmental entity.  As noted above, *supra* ¶¶ 56-57, the authority and duties delegated to the Committee through its enabling statute could make access to the Department's confidential information necessary for the Committee to carry out its responsibilities under law to protect children from abuse and neglect.

how it is being served." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 865 (2020) (quotation marks omitted).

[¶61]  In the instant matter, as of the time the Committee issued its subpoena (and then sought to enforce it), the Committee had not yet received (i) any of OPEGA's evaluations on the Department's handling of investigations regarding the four deceased children to supplement the report on child protective services investigations, or (ii) the final phase of the comprehensive review—An Evaluation Report on Protecting Child Safety – Reunification and Permanency.[22]  Thus, the Committee would not have been in a position to discern whether it needed access to the confidential files in order to determine whether to fully endorse, endorse in part, or withhold endorsement of the reports or propose legislation based on them.  The judgment therefore should be affirmed on these grounds rather than those set forth in the Court's opinion.

---

[22] The record does not show that these items were not yet received at the time of the Committee's subpoena and motion to compel.  However, OPEGA's February 2024 Information Brief on Child Protective Services Reunification confirms that the Committee had not yet received these items at the time of its subpoena and motion.  *See* Information Brief – Child Protective Services Reunification 1 (Feb. 2024).  A court may take judicial notice of facts when the accuracy of the source cannot reasonably be questioned.  *See* M.R. Evid. 201(b).  We have long held that we may take judicial notice of facts on appeal.  *See, e.g.*, *Nader v. Me. Democratic Party*, 2013 ME 51,¶ 20 n.10, 66 A.3d 571 ("[W]e may take judicial notice."); *State v. Moulton*, 1997 ME 228, ¶ 17, 704 A.2d 361 ("We may take judicial notice on appeal."); *First Nat'l Bank of Bost. v. Me. Tpk. Auth.*, 136 A.2d 699, 714 (Me. 1957) ("We may take judicial notice of [this] fact."); *Goodwin v. Small*, 43 A. 507, 507 (Me. 1899), ("[W]e may take judicial notice of the fact.").  The accuracy of the timeline provided by OPEGA's Information Brief cannot reasonably be questioned, and therefore we may take judicial notice of the timeline regarding OPEGA's final report and the four evaluations.

[¶62]  Accordingly, although I affirm the denial of the request to compel compliance with the subpoena at issue here, I do not believe that this ruling precludes the future issuance of a subpoena for the confidential child protection records or, if necessary, the filing of a motion to compel compliance with such a subpoena, so long as the Committee is taking such action in order to review and determine whether it endorses the OPEGA reports and to determine what, if any, legislation to propose to implement OPEGA's findings and recommendations.  Despite the circuitous nature of the authority to access confidential information fashioned by the Legislature at issue here, the Committee nonetheless has that authority and may bring it to bear in appropriate circumstances.[23]

---

Joshua D. Dunlap, Esq. (orally), Pierce Atwood LLP, Portland, for appellant Government Oversight Committee

Thomas A. Knowlton, Deputy Attorney General, Ariel Piers-Gamble, Asst. Atty. Gen., and Hunter C. Umphrey, Asst. Atty. Gen. (orally), Office of the Attorney General, Bangor, for appellee Department of Health and Human Services

Kennebec County Superior Court docket number CV-2022-163
FOR CLERK REFERENCE ONLY

---

[23]  Given the gulf between the views on this point expressed in the Court's opinion and this concurrence, the Legislature may well want to consider clarifying the scope of the Committee's authority to access confidential information in these circumstances.